# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

Quisi Bryan,                                    Case No. 1:11CV60

               Petitioner

         v.                                **ORDER**

David Bobby, Warden,

               Respondent

      This is a capital habeas corpus case under 28 U.S.C. § 2254.

      In 2000, a jury in the Common Pleas Court of Cuyahoga County, Ohio, convicted the petitioner, Quisi Bryan, of the aggravated murder of Wayne Leon, an Officer of the Cleveland Police Department. The jury recommended that Bryan receive a death sentence, and the trial court adopted the recommendation and sentenced Bryan to death.

      Bryan now seeks habeas relief on sixteen grounds.

      For the following reasons, I grant the petition on Bryan's claim that the prosecution violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by using a peremptory strike to remove an African-American from the venire. The State of Ohio must therefore release Bryan from custody unless, within 120 days of the entry of this order, it elects to retry him.

**Background**

In August, 2000, the Cuyahoga County grand jury indicted Bryan on three counts of aggravated murder, two counts of attempted murder, and multiple counts of firearms-related offenses.

Each aggravated-murder count carried four death-penalty specifications that, if proved, would make Bryan eligible for a death sentence.

The specifications alleged Bryan had killed Officer Leon: 1) while Leon was engaged in his official duties as a police officer, *see* O.R.C. § 2929.04(A)(6); 2) with the specific purpose to kill a police officer, *see id.*; 3) to escape detection, apprehension, trial, or punishment for another offense, *see* O.R.C. § 2929.04(A)(3); and 4) as part of a "course of conduct" in which Bryan had killed or attempted to kill two or more people, *see* O.R.C. § 2929.04(A)(5).

With the assistance of two lawyers qualified to handle capital cases, Bryan went to trial on these charges in October, 2000, less than three months after Officer Leon's murder. According to the Ohio Supreme Court, whose factual determinations are presumptively correct on habeas review, 28 U.S.C. § 2254(e)(1), the prosecution's evidence showed that:

> Early in 2000, Quisi Bryan, who was at the time married, began living together with Janie Winston, his 18-year-old girlfriend, at her Cleveland residence. Bryan supported himself by selling drugs and "hitting licks," i.e., robbing other drug dealers. He owned a revolver, carried a Glock .45 caliber semiautomatic handgun, and at all times, kept a shotgun hidden inside Winston's mattress. At that time, he told Winston that his parole officer was looking for him because he "had got caught up with writing his name on some cashier's checks and—or traveler's checks." He told Winston, though, "I'm going to go in under my own terms." In fact, Bryan had been indicted for theft and receiving stolen property, and arrest warrants had been issued alleging him to be a parole violator.

2

Around 11:00 or 11:30 p.m. on Saturday, June 24, 2000, Bryan told Winston that he was leaving the house to "hit a lick." She did not hear from him again until late the next morning.

Around 11:00 a.m., on Sunday, June 25, 2000, while alone on routine patrol in his police cruiser, Officer Wayne Leon apparently noticed irregularities on the temporary license tag on Bryan's Pontiac Grand Prix. Leon followed Bryan's car as it stopped at a Sunoco service station located at the corner of East 40th Street and Community College Avenue.

Officer Leon and Bryan both exited their vehicles after stopping. Leon first inspected Bryan's temporary tag and noticed that it had been altered. He then obtained Bryan's driver's license to run a police check on him and on the vehicle.

Officer Leon and Bryan stood next to the cruiser as Leon called the station using his police radio transmitter on his right shoulder. Leon's right hand was on the radio transmitter and his left hand was holding Bryan's driver's license. As Leon turned his head to talk over the radio, Bryan pulled his Glock handgun from his coat and shot Leon in the face. As Leon lay on the ground, Bryan retrieved his driver's license, returned to his car, and sped away. Officer Leon died from that gunshot.

While waiting at a traffic light next to the Sunoco station, Kenneth Niedhammer heard the gunshot and saw a police officer lying on the pavement. Niedhammer then saw a white Pontiac Grand Prix drive erratically from the Sunoco station. Niedhammer, who was driving a private security vehicle, pursued the Grand Prix. While in pursuit, Niedhammer activated the security vehicle's siren and flashing lights.

On East 39th Street, Bryan stopped behind a vehicle driven by Cad Holly Matthews, who was waiting at a stop sign. Bryan exited his Grand Prix and started shooting at Niedhammer. One of Bryan's shots hit a spotlight on Niedhammer's vehicle, which was only six to eight inches from Niedhammer's head. A ricochet from another shot bruised Niedhammer's forearm. One of Bryan's shots also struck an upstairs bedroom window in Matthews's nearby home near where Matthews's granddaughter, her fiancé, and their eight-month-old son were sleeping. Niedhammer stopped, exited his vehicle, and returned fire.

Following the exchange, Bryan sped away with Niedhammer in pursuit. After a few more blocks, Bryan stopped again, got out of his car, and again fired at Niedhammer. Niedhammer stopped his vehicle behind Bryan's car and fired two or three shots at Bryan. After a minute or so, Bryan returned to his car and drove away with Niedhammer in pursuit.

3

Bryan eventually lost control of his vehicle and collided with several parked cars and a church van. Although dazed by the crash, Bryan grabbed his backpack and gun and ran away.

After running a short distance from the crash scene, Bryan approached a group of men and asked whether he "could pay somebody to drop him off because guys was after him." For $30, Barry Philpot drove Bryan to a designated location and dropped him off. Bryan threw his Glock handgun into a nearby dumpster, went to his wife Elaine Bryan's home, and fled in her blue Dodge Spirit.

Bryan then called Winston, told her "that something happened" and that she should pack some clothes." He met Winston at a supermarket, and they drove to his father's home. Bryan obtained a handgun from his father's house and put it under the car seat. Bryan and Winston then drove to Columbus.

While driving to Columbus, Bryan told Winston, "I hope he don't die. * * * I shot a police officer in the face." Bryan explained that a police officer had stopped him, "they exchanged words, and [Bryan] pulled out his gun, put it to his head * * * and [as] the officer was reaching for his [gun] * * * [Bryan] shot him." Bryan also said, "I just can't go back under their terms. I'm going to go under mine. * * * [I]f this man dies, I will never see the day of light again or I will just get life in prison. Janie, I just can't go back."

In Columbus, Bryan drove to an ex-girlfriend's house and tried unsuccessfully to buy some crack cocaine. He then told Winston, "Well, we going to catch a train to Pennsylvania. Then from Pennsylvania we going to fly to Florida. Then from there we going to try to leave the country."

While looking for a Columbus hotel, Bryan offered a stranger, Gerald Alfred, money to rent a hotel room for them. During the late afternoon on June 25, Bryan and Winston went into the hotel room with Bryan's backpack, which contained .45 caliber and .357 magnum cartridges, parts of a shotgun, two shotgun rounds, and gun-cleaning equipment. Winston placed the handgun that Bryan had obtained from his father's house underneath the bed in the hotel room.

Bryan told Winston that Alfred was going to help him look for some crack. Bryan left the room and told Winston that he would be "right back." When Bryan did not return, Alfred drove Winston to the Greyhound station so that she could return to Cleveland. She put the handgun into Bryan's backpack and took it with her.

By the time Bryan and Winston had arrived in Columbus, Cleveland police had already identified him as the main suspect in Leon's shooting by tracing the Pontiac's temporary license tag. From Elaine Bryan, they obtained a description of

4

the Dodge Spirit that Bryan was driving, and they broadcast a description of Bryan and the Dodge Spirit to police departments throughout Ohio and surrounding states.

Later that same day, Columbus Police Sergeant Tyrone Hollis spotted the Dodge Spirit, stopped his cruiser behind it, and arrested Bryan. As Bryan was being escorted to the police cruiser, he said, "I didn't shoot the cop. I was there." When he was in the cruiser, Bryan also blurted out, "I didn't pull the trigger."

Police later learned that Alfred had rented a hotel room for Bryan and a young lady. After police located Alfred, he described Winston and said that she was at the Greyhound station. Police then arrested Winston and seized Bryan's backpack.

Around 3:00 a.m. on June 26, Cleveland Police Detective Michael O'Malley attempted to interview Bryan in Columbus. As Bryan was brought to the roll-call room, he said, "You probably think I'm some kind of animal." After O'Malley advised Bryan of his *Miranda* rights, Bryan said that he did not wish to talk about the incident. However, Bryan did say, "I feel sorry for the officer and things aren't like they seem."

Following Officer Leon's murder, police investigators showed eyewitnesses a photo array to identify Leon's assailant. Neither Geneva Marie Jefferson, who had witnessed the shooting at the Sunoco station, nor Niedhammer was able to identify Bryan from a photo array. Similarly, neither George Abou–Nader nor Donnell Wingfield, then Sunoco station employees, was able to identify Bryan when first shown his photograph. However, Jefferson later identified Bryan as the assailant when she saw his picture on television. Wingfield and Abou–Nader also later identified Bryan when shown updated photographs of him. On June 28, Niedhammer identified Bryan from an updated photograph in a second photo array.

During the course of their investigation, police investigators recovered a .45 caliber shell casing at the Sunoco station. At the location of the second shooting, they also found five .45 caliber shell casings and a copper-colored jacket from a bullet. Police also removed a spent .45 caliber bullet embedded in a door of Matthews's home.

At trial, Cleveland Detective Thomas Lucey testified that the same Glock handgun fired the bullet recovered from Leon's body and the bullet and copper jacket recovered from the second shooting scene. Each bullet had eight lands and grooves and a right-hand twist. Moreover, unique impressions left on each bullet were characteristic of the manufacturing process of Glock barrels.

According to Detective Lucey, the same Glock handgun ejected the .45 caliber shell casings found at the Sunoco station and at the second shooting scene.

This conclusion was based on four points of comparison: firing pin impressions, breech face markings, and extractor and ejector markings.

Following Bryan's arrest, police found "two unique gunshot residue particles" on Bryan's right hand. Gunshot residue was also found on the driver's door handle inside Bryan's Grand Prix and in the roof area behind the driver's side rear window.

Julie Heinig, a forensic scientist, concluded that biological DNA material removed from an inhaler and two cigar butts found in the Grand Prix contained Bryan's DNA profile. In the case of the inhaler, the probability of finding another individual with the same DNA profile was more than one in a hundred trillion for Caucasians and more than one in a quadrillion for African–Americans.

Dr. Stanley Seligman, a deputy coroner, testified that Leon died as the result of a single gunshot to the head and neck. In addition, the coroner recovered a .44 or .45 caliber, copper-jacketed bullet from Leon's body. Stippling on his face showed that Leon was shot from a distance of approximately two and one-half feet. Moreover, the bullet's trajectory was consistent with testimony that Leon's face was turned to the right when he was shot.

*State v. Bryan*, 101 Ohio St. 3d 272, 274-77 (2004).

Bryan did not dispute that he killed Officer Leon.

Rather, Bryan claimed he fired the fatal shot as part of a "reflexive motion" Bryan made after seeing Officer Leon reach for his police radio. That claim, and the evidence the defense adduced to support it, led the trial court to issue a lesser-included-offense instruction on voluntary manslaughter.[1]

According to the Ohio Supreme Court:

Bryan testified in his own behalf. He disclosed that he had been released on parole on November 2, 1998, for attempted robbery, that his parole was scheduled to end on December 2, 1999, and that he had married Elaine in September 1999.

---

[1] Consistent with O.R.C. § 2903.04(A), the court instructed the jury that a person commits involuntary manslaughter when he causes the death of another as a proximate cause of committing or attempting to commit a felony. (Doc. 58 at 147).

In November 1999, Bryan's parole officer had informed him that he was being investigated for receiving stolen property and could not be released from parole because of a pending indictment. Bryan did not return to visit his parole officer, explaining, "I thought * * * I would be arrested." To avoid arrest, Bryan left his wife and moved in with Winston.

He further admitted that he supported himself by selling drugs and that he owned a .45 caliber Glock, a .357 caliber revolver, and a shotgun. Elaine purchased the Glock in her name because he was a convicted felon.

According to Bryan, Officer Leon stopped him on June 25 for driving with altered license tags. After further inspecting the tags, Leon called them "fictitious." Leon then started talking into his radio mike, and Bryan was "trying to think of a way to convince him to stop." Bryan then pulled a handgun, "pointed it at his mike," and said, "Don't do that." Bryan testified that in response, Leon jumped back, pivoted, and his "right hand came down towards his weapon." Bryan then shot Leon.

Bryan further testified that after the shooting, he drove off at a high rate of speed. Bryan saw a security car following him and stopped behind Matthews's car at East 39th Street and Central. Bryan said that he had planned to leave his car and run away. However, he said, "[a]s soon as I opened the door and jumped out, I was fired on." Bryan testified that he then fired four or five shots at Niedhammer, got back into his car, and sped away. Bryan denied that he had shot at Niedhammer two separate times.

After hitting the church van, Bryan left his vehicle, took his Glock handgun and backpack, and fled on foot. Bryan later threw the Glock into a dumpster.

Bryan denied that he intended to kill Officer Leon. Rather, he said, "I just wanted to convince him * * * with the weapon not to call on the mike." According to Bryan, he said that he "pointed right at the mike" when he shot him. Bryan said that he was "very remorseful" after shooting Leon, insisting "There's not a day that goes by that I don't think about it." During cross-examination, Bryan said that he had pulled the trigger as just "a reflexive motion to [Leon's] jump."

*Bryan*, *supra*, 101 Ohio St. 3d at 277-78.

After hearing this evidence, the jury rejected Bryan's manslaughter defense and convicted

Bryan on all counts, save for one count of aggravated murder (which alleged Bryan killed Officer

Leon with prior calculation and design (*see* Doc. 58 at 206)) and one count of improperly discharging a firearm.

At the penalty phase, the jury unanimously recommended that Bryan receive a death sentence, and the court adopted the recommendation and sentenced Bryan to death. O.R.C. § 2929.03(D)(2), (3) (defining when jury may recommend death sentence and when court may adopt that recommendation).

### Direct Appeal

Bryan appealed to the Ohio Supreme Court, raising nineteen claims:

1.  The trial court erred by having ex parte communications with Juror Bross and removing him from the jury during trial because of his inability to vote for a death sentence in appropriate circumstances;

2.  Ohio's death penalty statute does not satisfy the Eighth Amendment's narrowing requirement;

3.  The trial court erred in refusing to dismiss two veniremembers who were biased in favor of capital punishment;

4.  The trial court erroneously excluded a veniremember who was not biased in favor of capital punishment;

5.  The prosecution violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by using a peremptory strike to remove African-American veniremember Crystal Jones;

6.  The trial court erred in refusing to grant the defense a two-month continuance before trial;

7.  The prosecutor committed misconduct by:

    (A)  cross-examining Bryan about the facts underlying his prior conviction for attempted robbery;

    (B)  misstating the law during voir dire; and

8

(C)     urging the jury, during his closing argument at the guilt phase, to have sympathy for Officer Leon and his survivors;

8.     The trial court erred in admitting "other crimes" evidence;

9.     Trial counsel were ineffective at the guilt phase because they:

(A)     did not move for a change of venue based on adverse pretrial publicity;

(B)     did not interview prosecution witness Janie Winston after learning she had given conflicting statements to police;

(C)     failed to:

(i)     object to the use of the term "recommendation" for the jury's decision at the penalty phase;

(ii)    request that the trial court define "mitigation" during voir dire;

(iii)   object to improper jury instructions mentioned during voir dire;

(iv)    move to strike a juror for cause;

(v)     object when the trial court told jurors that the death penalty was appropriate if the aggravating circumstances "outweighed" the mitigating factors;

(vi)    object when the trial court and the prosecutor:

(a)     equated the death-penalty specifications in the indictment with the aggravating circumstances that might warrant a death sentence;

(b)     defined mitigating evidence as "good things" about Bryan; and

(c)     informed the jury that its verdict at the punishment phase had to be unanimous;

(vii)   failed to object to the instruction on reasonable doubt; and

9

> > (viii) failed to object to the prosecutor's closing argument urging the jury to have sympathy for Officer Leon; and
>
> > (D) delivered a closing argument that did not portray Bryan in a favorable light

10. The trial court failed to provide the jury with accurate instructions re. the meaning of "mitigation" and that death was appropriate only if the aggravating circumstances outweighed the mitigating evidence beyond a reasonable doubt;

11. The evidence was insufficient to prove Bryan guilty of attempted murder, or that he committed the murder as part of "course of conduct";

12. The prosecutor committed misconduct when, in his closing argument at the penalty phase, he:

> (A) suggested the jury had to sentence Bryan to death to protect the community and to satisfy the community's outrage;

> (B) referred to Bryan as a ticking "time-bomb";

> (C) referred to the "course of conduct" specification as a "mass murder" specification; and

> (D) argued the facts and circumstances of the crime as aggravating circumstances, in violation of Ohio law;

13. Trial counsel were ineffective at the penalty phase because:

> (A) despite conducting a substantial mitigation investigation, they decided not to present the bulk of the mitigating evidence they had generated;

> (B) they failed to object to the prosecutor's misstatements of law and his improper argument; and

> (C) they called Bryan's mother as a mitigation witness but elicited testimony from her that was more harmful than helpful;

14. The trial court improperly admitted at the penalty phase all evidence introduced at the guilt phase;

15.     The trial court failed to merge the "course of conduct" specification with the specification alleging Bryan killed Officer Leon during the course of his duties;

16.     The trial court's instruction on reasonable doubt was improper under *Cage v. Louisiana*, 498 U.S. 39 (1990);

17.     Given the cumulative effect of all errors by the trial court, the prosecutor, and defense counsel, Bryan did not receive a fair trial;

18.     The Ohio Supreme Court's failure to conduct a meaningful proportionality review of death sentences in past cases violated the Due Process Clause; and

19.     The death penalty as applied in Ohio is unconstitutional.

(Doc. 31 at 38-193).

In a decision entered in March, 2004, the Ohio Supreme Court affirmed Bryan's convictions and death sentence. *Bryan*, *supra*, 101 Ohio St. 3d at 278-306. The court denied Bryan's ensuing motion for reconsideration. *State v. Bryan*, 102 Ohio St. 3d 1449 (2004).

After obtaining new counsel, Bryan filed, in August, 2004, an application to reopen his appeal under Ohio Supreme Court Rule of Practice XI, § 6. That Rule permits a condemned defendant to request the state high court to reopen his appeal and consider whether his appellate counsel was ineffective.

Bryan's application alleged appellate counsel had been ineffective for not raising twenty additional claims:

1.     The death sentence was invalid because the indictment alleged Bryan committed the murder to escape detection or apprehension for a "specified offense," but the proof showed he committed the murder only to avoid detection for violating his parole;

2.     Because a parole violation is not an offense for purposes of O.R.C. § 2929.04(A)(3), Bryan could not be found death-eligible under the (A)(3) specification;

11

3.      The death sentence was invalid because the prosecution failed to prove Bryan committed the offense of receiving stolen property or theft, as alleged in the (A)(3) specification;

4.      The (A)(3) specification was unconstitutionally vague;

5.      Trial counsel were ineffective for failing to move for a change of venue;

6.      The venire from which Bryan's jury was selected did not represent a fair cross-section of the community;

7.      The trial judge was biased because he was related to a police officer and had attended Officer Leon's funeral;

8.      The trial court curtailed questioning during voir dire and wrongly denied several defense challenges for cause;

9.      The trial court's instruction on involuntary manslaughter was erroneous;

10.     The trial court engaged in an improper ex parte communication with a juror;

11.     Trial counsel were ineffective for failing to prevent the prosecutor from introducing evidence of Bryan's prior felony conviction and his status as a parole violator;

12.     Bryan was denied his right to be present when, during deliberations, the trial court answered the jury's questions outside Bryan's presence;

13.     Trial counsel were ineffective for failing to conduct an adequate voir dire;

14.     Trial counsel were ineffective for failing to examine the video camera mounted on Officer Leon's dashboard;

15.     The trial court "repeatedly and improperly influence[d] the nature, scope and duration of the jury's consideration of the evidence";

16.     Trial counsel were ineffective for failing to introduce "a large quantity of mitigating evidence";

17.     Bryan's death sentence violated the United Nations Convention on the Prevention and Punishment of the Crime of Genocide;

18.  The trial court's instructions regarding the death-penalty specifications were vague and confusing;

19.  The trial court improperly questioned one of the prosecution's expert witnesses; and

20.  The trial court sustained "nonexistent objections" during defense counsel's cross-examination of various witnesses.

(Doc. 31 at 451-58).

The Ohio Supreme Court denied Bryan's application to reopen because Bryan did not file the application within ninety days after the court had entered its judgment on the merits, as the court's rules required. (Doc. 31 at 488); *see* OH Sup. Ct. Prac. R. XI, § 6(A).

### State Postconviction Review

While his direct appeal was pending, Bryan filed, in December, 2001, a postconviction petition in the Cuyahoga County Common Pleas Court. With the assistance of counsel, Bryan raised two claims:

1.  Trial counsel were ineffective at the guilt phase for:

    (A)  not moving for the appointment of a firearms expert; and

    (B)  electing to have Bryan, with counsel's help, reenact the shooting of Officer Leon; and

2.  Trial counsel were ineffective at the penalty phase for not:

    (A)  retaining a competent psychologist to help prepare the defense's case;

    (B)  interviewing Bryan's friends and family members;

    (C)  using available records to support the defense's case in mitigation;

    (D)  adequately preparing Bryan's mother to testify;

13

    (E)      presenting evidence that Bryan would have adjusted well to life in prison;

    (F)      conducting an adequate investigation to determine whether Dr. Kaleta, a psychologist who assisted the defense before and during trial, was competent to prepare a mitigation case;

    (G)      investigating, preparing, or presenting available mitigation evidence;

    (H)      conducting a reasonable investigation and obtaining a competent psychological expert to testify on Bryan's behalf;

    (I)      calling a cultural mitigation expert to testify about the cultural issues Bryan faced as African-American growing up in the inner-city; and

    (J)      calling a substance-abuse expert to testify.

(Doc. 33 at 98-131; Doc. 35 at 35-45).

In May, 2009, the state trial court denied the petition without holding an evidentiary hearing. (Doc. 35 at 132-44; Doc. 36 at 54-57).

Bryan appealed to the Eighth District Court of Appeals, raising the same claims he had raised in the trial court. He also contended the postconviction trial court should have: 1) permitted him to conduct discovery; and 2) appointed a neuropsychologist.

The appellate court affirmed the denial of postconviction relief. *State v. Bryan*, 2010-Ohio-2088 (Ohio App.) (*Bryan II*).

Bryan then petitioned the Ohio Supreme Court for leave to appeal, seeking to press the same claims he had raised in the appellate court. On December 15, 2010, the court declined jurisdiction. *State v. Bryan*, 127 Ohio St.3d 1461 (2010).

**Federal Habeas Petition**

Bryan filed his § 2254 petition on August 15, 2011, raising sixteen grounds for relief:

14

1.      The trial court violated Bryan's due process rights by engaging in an ex parte communication with Juror Bross and removing him, sua sponte, from the jury mid-trial;

2.      The trial court should have excused Juror McClellan because she was biased in favor of capital punishment;

3.      The trial court erred in excusing veniremembers Hawkins and Bailey because their views on capital punishment did not impair their ability to serve on the jury;

4.      The Ohio courts violated Bryan's liberty interest in having the jury death-qualified under the test established in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), rather than the more lenient test set forth in *Wainwright v. Witt*, 469 U.S. 412 (1985);

5.      The prosecution violated *Batson* by using a peremptory strike to excuse veniremember Jones;

6.      The prosecutor committed misconduct during the guilt phase by:

   (A)     questioning Bryan about the facts underlying his prior conviction;

   (B)     urging the jury to send a message to the community with its verdict and have sympathy for the victim; and

   (C)     characterizing Bryan's involuntary-manslaughter defense as an attempt to "swindle" the jury;

7.      The prosecutor committed misconduct during the sentencing phase by:

   (A)     urging the jury to consider the community's outrage at the death of a police officer;

   (B)     arguing the defense was trying to "swindle" the jury by presenting the manslaughter defense;

   (C)     arguing that a sentence other than death would tell the community it was okay to kill a police officer;

   (D)     aligning himself with the jury in arguing, in effect, that "we must" impose a death sentence; and

(E)    arguing the lack of mitigating circumstances surrounding the murder was, effectively, an aggravating circumstances supporting a death sentence;

8.    Trial counsel were ineffective at the penalty phase because they:

(A)    failed to introduce "any meaningful mitigation" evidence;

(B)    failed to prepare Bryan's mother to testify effectively;

(C)    did not present evidence Bryan earned a GED while in jail and had adjusted well to incarceration;

(D)    failed to call a neuropsychologist to testify about the multiple head injuries Bryan sustained in childhood;

(E)    failed to retain a cultural mitigation expert to tell the all-white jury about Bryan's experience growing up as an African-American in the inner city; and

(F)    failed to retain a substance abuse expert;

9.    Trial counsel were ineffective at the guilt phase because they failed to:

(A)    call a firearms expert to testify that it was necessary to apply only a light amount of trigger pressure to fire the gun that killed Officer Leon;

(B)    exclude evidence of Bryan's prior felony conviction and status as a parole violator; and

(C)    view the videotape from Officer Leon's dashboard camera;

10.    Appellate counsel was ineffective for failing to argue that:

(A)    the evidence was insufficient to prove that:

(i)    Bryan killed Officer Leon to avoid detection or apprehension for an "offense"; and

(ii)    Bryan committed the offenses of receiving stolen property and theft, as alleged in the (A)(3) specification;

16

      (B)      consequently, because the (A)(3) specification was invalid, the jury's weighing process was skewed in favor of the death penalty; and

      (C)      the specification was vague and allowed the jury to base its verdict on alternative factual theories;

11.      The trial court violated Ohio law by failing to merge the capital specifications alleging Bryan killed Officer Leon during the course of his lawful duties and as part of a "course of conduct";

12.      The trial court denied Bryan his right to be present by answering several of the jury's questions during the guilt-phase deliberations outside of Bryan's presence;

13.      The trial court denied Bryan a fair trial by:

      (A)      admitting "bad acts" evidence; and

      (B)      leading the jury to believe it was ultimately the court's responsibility, not the jury's, to decide whether Bryan would receive a death sentence;

14.      The Ohio Supreme Court failed to conduct an adequate proportionality review of Bryan's death sentence, as O.R.C. § 2929.05 requires;

15.      Ohio's execution protocol violates Bryan's right to be free from cruel and unusual punishment; and

16.      The death penalty is unconstitutional because:

      (A)      Ohio's system is arbitrary and discriminates against African-Americans; and

      (B)      it violates international treaties to which the United States is a party.

In 2013, I denied Bryan's motion to conduct discovery and expand the record. (Doc. 71).

Now, after further study of the petition, the Warden's return, and Bryan's traverse, this case is ripe for decision.

17

## Discussion

The habeas corpus statute "bars relitigation" of those claims a state court adjudicated on the merits, unless the "state court's decision was contrary to federal law then clearly established in the holdings of" the United States Supreme Court, "involved an unreasonable application of such law," or "was based on an unreasonable determination of the facts." *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 785 (2011); 28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law only if the court "applies a rule that contradicts the governing law set forth in [Supreme] Court cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

A state court's application of the governing legal rule is unreasonable when the court "err[s] so transparently that no fairminded jurist could agree with the court's decision." *Bobby v. Dixon*, — U.S. —, 132 S. Ct. 26, 27 (2011); *see also White v. Woodall*, — U.S. —, 134 S. Ct. 1697, 1706-07 (2014) (relief available under unreasonable-application clause "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question") (internal quotations omitted).

### A. Removal of Juror Bross

Bryan's first claim is that the trial court violated his right to a fair trial by: 1) having ex parte communications with Juror Bross regarding Bross's concerns about serving on the jury; and 2) removing Bross from the jury during trial after concluding his views on capital punishment impaired his ability to serve as an impartial juror.

18

### 1. Background

On October 30, 2008 – the first day of evidence – Bross approached the trial court and, during an off-the-record exchange, "expressed concern that his photograph had appeared" in a recent edition of the Cleveland *Plain Dealer*. *Bryan*, *supra*, 101 Ohio St. 3d at 282.

The photo depicted the jurors attending a jury-view of the gas station where the murder occurred. *Id.* at 283 n.1. (Although the Ohio Supreme Court described the photo as depicting only the jurors' backs, which suggests their faces were not visible, Bross would later testify his stepfather and coworkers had identified him in the photo.).

The judge "briefly talked to Bross and told him not to mention it to any fellow jurors, that [the judge] would look into the matter and discuss it with him sometime later." *Id.* at 283. Immediately after its exchange with Bross, the court obtained a copy of the *Plain Dealer* and – contrary to repeated misstatements in Bryan's pleadings (*e.g.*, Doc. 64 at 3) – notified counsel for both sides of his colloquy with Bross. *Bryan*, *supra*, 101 Ohio St. 3d at 283.

When the trial court spoke with Bross the next day, October 31 – again outside the presence of counsel – Bross again "expressed reservations about continuing as a juror." *Id.*

The court therefore conducted an in-chambers voir dire of Bross the next day, November 1, at which both sides were present. According to the Ohio Supreme Court, at that hearing:

> Bross stated, "The concern * * * is that people may recognize me wherever, at home, at work, on the street or supermarket or other places from that picture [and] it might affect what I have to do as a juror." During ensuing questions, the trial judge told Bross, "I've looked at you for eight days. I wouldn't be able to identify you from this photograph." Bross asserted that the news photograph would not affect his ability to decide guilt or innocence. However, when asked about deliberating on the death penalty, Bross said, "I'm just thinking that somehow that can be put on me."

19

Following Bross's responses, the trial court stated, "I'm just thinking that this * * * photograph is not the issue. I'm beginning to think that the issue is * * * the possible imposition of capital punishment in this case." When asked if he could sign a death penalty verdict, Bross said "No" and mentioned that his death penalty views had "evolved" since the trial began. The trial court and Bross then had the following discussion:

> "Q:    This photograph is not—I don't want to call it a false issue. It's an issue. It's a concern of yours.
>
> "A:    Yes.
>
> "Q:    But bottom line is, when we were in the courtroom last week during individual voir dire, your response to the question about whether or not you could sign a death warrant was yeah, * * * you could follow the law?
>
> "A:    Yes.
>
> "Q:    Today it is no, you could not, is that correct?
>
> "A:    That is correct.
>
> "Q:    * * * In part that's due to the photograph, but in part it's due to the fact that the photograph has triggered you to do some additional thinking; is that fair to say?
>
> "A:    Yes."

Over defense objection, the trial judge excused Bross and replaced him with an alternate juror.

*Bryan*, *supra*, 101 Ohio St. 3d at 283.

## 2. State Court's Decision

The Ohio Supreme Court held that the trial court acted properly in removing Bross from the jury, given his professed inability to sign a death verdict. It also concluded Bryan procedurally defaulted his claim regarding the court's ex parte communication with Bross:

20

The standard for determining whether a prospective juror may be excluded for cause is whether that juror's views on capital punishment would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.'" See *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, following *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. This test applies whether the juror favors capital punishment or opposes it. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 86, 656 N.E.2d 643. A trial court's ruling on a challenge for cause will not be disturbed on appeal unless the trial court abused its discretion. See *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915. Moreover, the same standards apply where, as in this case, a seated juror informs the court that he or she can no longer follow the law and sign a death verdict.

Here, the trial court did not abuse its discretion. Bross stated that he could not follow the law during the penalty phase and could not sign a death penalty verdict. Thus, Bross was properly excused.

Bryan's argument that the trial court erred by excusing Bross during trial is ill-founded. Crim.R. 24(F)(1) provides that "[a]lternate jurors * * * shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Moreover, in *State v. Hutton* (1990), 53 Ohio St.3d 36, 559 N.E.2d 432, paragraph three of the syllabus, this court held, "Crim.R. 24(F) is not violated in a capital case where an alternate juror is substituted for another juror after the guilt phase verdict, but before deliberations begin in the penalty phase." Thus, even though the trial had begun, the trial court did not abuse its discretion in excusing Bross once Bross stated had [*sic*] that he could no longer follow the law.

Bryan's complaint of prejudicial error because of the trial court's brief ex parte discussions with Bross can also be dismissed. Trial counsel did not object to the ex parte discussions. Moreover, during the hearing in chambers, trial counsel never asked Bross about his ex parte communications with the trial judge or the effect such communications had upon Bross's ability to continue as a juror. Thus, Bryan waived all but plain error. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 121, 734 N.E.2d 1237.

The trial court's ex parte discussions with Bross were not plain error. To establish prejudice from such ex parte communications, "the complaining party must first produce some evidence that a private contact, without full knowledge of the parties, occurred between the judge and jurors which involved substantive matters." *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph thirteen of the syllabus. The complaining party must also show actual prejudice. *State v. Hessler*, 90 Ohio St.3d at 122, 734 N.E.2d 1237; *State v. Johnson* (2000), 88 Ohio

St.3d 95, 107–108, 723 N.E.2d 1054. Here, the trial judge's discussions with Bross were very brief, and once the trial judge became aware of Bross's concerns, a hearing with both counsel was conducted. Thus, the lack of prejudice is manifest.

*Bryan*, *supra*, 101 Ohio St. 3d at 284-85.

### 3. Propriety of Removing Bross

"[A] criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007). Therefore, a court may not excuse a veniremember "simply because [he] voiced general objections to the death penalty or expressed conscientious moral scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968).

But the State, too, "has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes." *Uttecht*, *supra*, 551 U.S. at 9.

To balance these competing interests, the Supreme Court established the "substantial impairment" test, which asks "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).

Here, the Ohio Supreme Court did not "appl[y] a rule that contradicts" *Witherspoon*, *Witt*, or any other Supreme Court precedent. *Williams*, *supra*, 529 U.S. at 405.

Rather, the state court recognized Bryan's right to a jury that included persons who, despite their personal opposition to capital punishment, could nevertheless apply the law fairly, but concluded Bross's removal was consistent with that right. *Bryan*, *supra*, 101 Ohio St. 3d at 284. For that reason, the state court's decision was not "contrary to . . . clearly established Federal law." 28 U.S.C. § 2254(d)(1).

22

Nor was the state court's judgment that the trial court properly excluded Bross "so lacking in justification" as to be unreasonable. *Harrington*, *supra*, 131 S. Ct. at 786-87.

Bross testified unequivocally that he could not "sign a verdict form that would call for the imposition of the death penalty in this case," even if he believed the facts warranted such a sentence. (Doc. 56 at 445).

Near the end of the in-chambers voir dire, moreover, after the defense had had an opportunity to rehabilitate Bross, Bross reiterated he could not, or would not, follow the law:

The Court:     But ultimately – and I think I've given everybody an opportunity now – ultimately, you know, we have got to make a decision tonight, right now, as to whether you could continue.

So given everything that has gone on during this case, can you – and really the issue is: can you – if the State of Ohio proves beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, can you sign a death warrant, in other words, join in on a verdict along with 11 other jurors that would call for the imposition of capital punishment?

Mr. Bross:     No.

The Court:     All right. We are ging [*sic*] to leave it there. I appreciate your candor.

(*Id.* at 457).

Given this testimony, there was no error in excluding Bross.

The premise of Bryan's claim to the contrary is that Bross's views on capital punishment had merely "evolved" since the trial began. (Doc. 18 at 48). Bryan notes that Supreme Court precedent contemplates that jurors hearing capital cases may change their opinions on the death penalty, given that many jurors likely have not grappled with that issue. *E.g.*, *Adams v. Texas*, 448 U.S. 38, 50-51 (1980).

23

I of course accept Bryan's contention that some jurors are likely to come to a capital case with fluid opinions about the death penalty, and that those opinions may "evolve" during trial. But Bryan's characterization of Bross's views on capital punishment as having merely evolved is simply not accurate, let alone the only reasonable interpretation of the record.

Under questioning by defense counsel, Bross testified that his inability or reluctance to vote for the death penalty stemmed from a concern that, after his photo had appeared in the *Plain Dealer*, people in the community – whether at work, in his personal life, or elsewhere – would recognize him as having been a juror in Bryan's case. (Doc. 56 at 446-56).

There is no evidence, moreover, suggesting Bross reached that conclusion after some sort of principled internal debate about the propriety of capital punishment generally or in Bryan's case specifically. Rather, Bross essentially acknowledged he could not prevent outside influences – primarily the reaction of his friends, family, or coworkers – from affecting his deliberations, and in particular his decision as to the proper penalty.

These comments, and the remainder of his testimony at the in-chambers voir dire, demonstrate Bross was not fit to serve on the jury.

Finally, Bryan contends the trial court's decision constituted a "tremendous abuse[ ] of discretion" because: 1) it occurred after jury selection concluded; and 2) Bross was "an ideal juror" from the defense's perspective.

There is, however, no prohibition on removing a juror mid-trial – let alone a juror whom the court determines, after a full hearing in which attorneys for both sides participated, is no longer qualified to serve. At bottom, Bryan's argument is – as the Warden aptly notes – that "since Juror Bross was originally accepted onto the jury, he should always remain a juror." (Doc. 59 at 42). As

24

there is no foundation for that argument in any clearly established Supreme Court precedent, I reject it.

For these reasons, Bryan is not entitled to relief on his claim the trial court erred in removing Bross from the jury.[2]

### 4. The Ex Parte Communication

Concurring in *Rushen v. Spain*, 464 U.S. 114, 125-26 (1983) (Stevens, J., concurring in judgment), Justice Stevens observed:

> [T]he mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication.

But "[w]hen an ex parte communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties." *Id.* at 118. The court should also conduct a hearing, "with all interested parties permitted to participate," to "determine the circumstances [of the ex parte communication], the impact thereof upon the juror, and whether or not it was prejudicial[.]" *Remmer v. U.S.*, 347 U.S. 227, 230 (1954).

The defense has the burden of demonstrating the ex parte communication caused actual prejudice. *Smith v. Phillips*, 455 U.S. 209, 215-17 (1982).

---

[2] In light of this ruling, I convert my prior denial, without prejudice, of Bryan's motion for leave to expand the record (Doc. 71) into a denial with prejudice. Because the state courts adjudicated this claim on the merits, I cannot consider Bryan's new evidence (an affidavit from Bross) for the only purpose Bryan wishes me to consider it: to prove the trial court had no basis to reexamine Bross about his views on the death penalty. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

As noted above, the Ohio Supreme Court rejected this claim because Bryan failed to object in the trial court (thereby forfeiting the claim under state law) and, alternatively, did not show the trial court's ex parte communication with Bross prejudiced him.

Those holdings prompt two questions: 1) did Bryan procedurally defaulted this claim; and 2) if not, what standard of review – AEDPA's deferential standard or de novo – applies to my review of the merits of the claim.

I can bypass the first question because, despite the state court's clear invocation of a procedural bar to reject this claim, the Warden did not argue procedural default. Accordingly, the Warden forfeited that defense. *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004).

The second question may be academic, as Bryan has effectively conceded § 2254(d) governs my review of the ex parte communication claim.

In pressing this claim in his traverse, Bryan contends "the Ohio Supreme Court's decision upholding the trial court's finding . . . was both and [*sic*] unreasonable application of law as well as an unreasonable determination of fact[.]" (Doc. 63 at 41). Nowhere does Bryan present a specific argument I should review the ex parte communication claim de novo. (*Id.* at 41-45).

In any event, I conclude that, under *Fleming v. Metrish*, 556 F.3d 520, 530-32 (6th Cir. 2009), the Ohio Supreme Court's review of Bryan's claim for plain error was an adjudication on the merits.

In *Fleming*, the Sixth Circuit held that where a state court had reviewed a *Miranda* claim for "plain error," after first determining the *Miranda* claim was forfeited under state law, the state court's holding that any *Miranda* violation did not amount to plain error was an adjudication on the merits for purposes of § 2254(d).

26

The Sixth Circuit explained that a state court's "[u]se of the plain-error standard of review, as opposed to the clearly erroneous or de novo standards, simply ma[k]e[s] reversal of the state trial court's judgment less likely[.]" *Id.* at 532. It does not, however, "cause the [state court] to bypass the merits of [the] claim." *Id.*

A review of the Ohio Supreme Court's decision here confirms the Sixth Circuit's observation in *Fleming* that plain-error review entails, at least some times, a review of a claim's merits.

In deciding whether Bryan had shown plain error, the state court addressed three issues bearing on the merits of Bryan's claim: 1) the scope of the ex parte communications between the trial judge and Bross; 2) the presence of Bryan's counsel at the *Remmer* hearing; and 3) the resulting prejudice, if any. *Bryan*, *supra*, 101 Ohio St. 3d at 284-85.

All of these considerations go directly to the merits of Bryan's claim – namely, whether he showed the challenged communications caused actual prejudice. *Smith*, *supra*, 455 U.S. at 215.

I therefore conclude the Ohio Supreme Court's no-plain-error determination was an adjudication on the merits. *Fleming*, *supra*, 556 F.3d at 532; *see also Frazier v. Jenkins*, 770 F.3d 485, 506 (6th Cir. 2014) (Sutton, J., concurring in part and concurring in judgment) (opining that *Fleming* "makes clear as day that a state court's plain-error review of an issue may receive AEDPA deference when the state court addresses the merits of the federal claim").[3]

---

[3] There appears to be something of a conflict between *Fleming* and *Frazier*. In *Frazier*, *supra*, 770 F.3d at 496 & n.5, the Sixth Circuit found that a state court did not adjudicate the merits of a procedurally barred claim under *Atkins v. Virginia*, 536 U.S. 304 (2002), when it concluded "there [was] no error, plain or otherwise." Because the Sixth Circuit in *Frazier* rejected the *Atkins* claim on default grounds, it did not directly address what standard of review applied to the petitioner's *Atkins* claim.

In so concluding, the Sixth Circuit relied on five of its prior decisions. But in *Fleming*, *supra*, 556 F.3d at 530-32, the court explained why some of those cited decisions did not address whether a state

Under that standard, Bryan's claim about improper ex parte communications fails.

The ex parte communications related to a significant aspect of the trial: Bross's concerns about continuing to serve, and doing so impartially, on the jury. Appropriately, then, the trial court immediately apprised counsel for both sides of this development and held a hearing at which both sides could – and did – inquire into the matter.

But given the record the parties developed at that hearing, the Ohio Supreme reasonably determined Bryan had not proved prejudice.

It is undisputed Bryan's lawyers did not ask "Bross about his *ex parte* communications with the trial judge or the effect such communications had upon Bross's ability to continue as a juror." *Bryan*, *supra*, 101 Ohio St. 3d at 284. Rather, defense counsel focused on what they apparently believed to be the more pressing task: rehabilitating Bross – their "ideal" juror, in Bryan's words – and trying to ensure he remained on the jury.

Finally, the Ohio Supreme Court found that the conversations between the trial court and Bross concerned only Bross's ability or willingness about serving on the jury after the *Plain Dealer* published his photograph. The record reflects the conversations were brief, and that "once the trial judge became aware of Bross's concerns, a hearing with both counsel was conducted." *Id.* at 285.

---

court's review of a claim only for plain error qualified as a merits adjudication. Moreover, two of the cases cited in *Frazier* held only that a state court's decision on the merits of a claim did not erase the state court's earlier ruling a claim was procedurally barred under state law. *Girts v. Yanai*, 501 F.3d 743, 755 (6th Cir. 2007); *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).

What happened in Bryan's case appears most analogous to what happened in *Fleming*: although the Ohio Supreme Court invoked a procedural bar in denying relief on the ex parte communications claim, it also addressed, and directly so, whether Bryan suffered prejudice from those communications.

In these circumstances, it was objectively reasonable for the Ohio Supreme Court to find the ex parte communication between the trial court and Bross did not prejudice Bryan. I therefore deny Bryan's first claim for relief.

## B. Denial of For-Cause Challenge to Juror McClellan

In his second ground for relief, Bryan contends the trial court should have dismissed Juror McClellan for cause because her views on capital punishment substantially impaired her ability to serve on the jury.

The Ohio Supreme Court rejected this claim on direct appeal, holding that the record supported the trial court's finding that McClellan was not biased in favor of the death penalty:

> During voir dire, McClellan initially revealed a predisposition to vote for the death penalty. When defense counsel asked McClellan about voting for the death penalty, she said, "If it is recommended, then * * * I don't know if I would consider anything other. That is kind of a hard question." In answering the prosecutor's follow-up questions, McClellan stated, "I would follow the law." Questioning continued with the following discussion:

| The Court: | Could you impose a sentence less than death in that case? |
|---|---|
| Ms. McClellan: | No. |
| The Court: | You could not? |
| Ms. McClellan: | No. |
| The Court: | So, in other words, you could not follow the law? If you want to ask me any questions, if you are confused, go ahead. |
| Ms. McClellan: | I am. I am still confused. You are saying that the aggravating circumstances is proved and it outweighs— |

29

| | |
|---|---|
| The Court: | No. What I'm saying is this: In order to apply the death penalty, the aggravating circumstances must outweigh the mitigating factors. |
| Ms. McClellan: | That's right. |
| The Court: | * * * If it was just the opposite — let's say that the prosecution wasn't able to prove that. * * * Could you then impose life or life with parole at 30 or 25? |
| Ms. McClellan. | I could. I could. |
| The Court: | So what you are saying is you could follow the law? |
| Ms. McClellan: | Yes. |

While McClellan was obviously confused by the questioning, her follow-up responses demonstrated her willingness to follow the law, evaluate mitigating factors, and consider a lesser sentence under appropriate circumstances. Given these answers, the trial court did not abuse its discretion in rejecting the challenge to McClellan for cause. See *State v. Treesh* (2001), 90 Ohio St.3d 460, 469, 739 N.E.2d 749 (juror's predisposition in favor of imposing death penalty did not require challenge where the juror later stated that she would follow the law and the court's instructions).

*Bryan*, *supra*, 101 Ohio St. 3d at 285.

Bryan contends the state court's decision involved an unreasonable application of the law and an unreasonable determination of the facts. He argues that McClellan, who acknowledged on her jury questionnaire that "her husband . . . was murdered" (Doc. 52 at 252), testified unambiguously the death penalty was the only appropriate punishment for Officer Leon's murder. Bryan also asserts the trial court, in attempting to clarify McClellan's answers, misstated the law as to when a death sentence is appropriate.

These contentions lack merit.

Taken as a whole, Juror McClellan's responses permitted the trial court to find her initial answers were the product of confusion, rather than a sincerely held belief that, no matter what the law might require, a death sentence was the only appropriate punishment for murder.

After both parties and the court had had an opportunity to question her, Juror McClellan told the court she was "still confused" about the legal framework that applied at the penalty phase. (Doc. 52 at 247-248).

The trial court therefore explained that, "to apply the death penalty, the aggravating circumstances must outweigh the mitigating factors," and McClellan responded, "That's right." (*Id.* at 248). The court then asked whether "what you [are] saying is you could follow the law," and McClellan said, "Yes." (*Id.* at 249).

Instead of stopping there, the trial court gave Bryan's attorneys another opportunity to prove McClellan's bias. But in response to defense counsel's questions, McClellan repeated her understanding of the law and her commitment to following it:

> Mr. Saffold: If we reach a second phase of this trial – we don't have to get to a second phase of this trial. There may never be a second phase of this trial.
>
> But if we get to a second phase of this trial, that means that Quisi Bryan has been already tried and convicted, and you, if you are on this jury, will have already found him guilty beyond a reasonable doubt of aggravated murder in either counts one, two, three, or all of them.
>
> After having found him guilty of aggravated murder, do you think that you could follow the law, Ms. McClellan, if the law directed you towards not giving the death penalty?
>
> Ms. McClellan: Yes.

31

| | |
|---|---|
| Mr. Saffold: | So you could consider not giving the death penalty under those circumstances? |
| Ms. McClellan: | Yes. |
| Mr. Saffold: | Now, initially you indicated to me that you couldn't consider that. |
| Ms. McClellan: | I wasn't clear on the issues. It's the level of it – |
| The Court: | All right. |
| Ms. McClellan: | – but I can follow the law. |
| The Court: | All right. Thank you very much. You may step down[.] |

(*Id.* at 249-51).

This evidence shows unambiguously that McClellan understood the law, was willing to consider mitigating evidence, and was not committed to imposing a death sentence. It also establishes that McClellan's initial statements that she would not consider a penalty other than death was due to her confusion about the governing law.

It was therefore reasonable for the Ohio Supreme Court to affirm the trial court's decision permitting McClellan to sit on the jury.

Bryan nevertheless claims the trial court misstated the law in questioning McClellan.

As Bryan notes, a death sentence is proper under Ohio law only if the jury finds, beyond a reasonable doubt, "that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors[.]" O.R.C. § 2929.03(D)(2).

In attempting to gauge McClellan's understanding of that standard, the trial court asked what McClellan would do if she "thought there was more mitigation than aggravating circumstances.

32

Could you then impose life or life with parole at 30 or 25?" (Doc. 52 at 248). McClellan's response was "I could." (*Id.*).

Bryan contends this was a misstatement of the law because "under Ohio law there is no statutory scenario which specifically requires or discusses the defendant having to demonstrate that the mitigating factors outweigh the aggravators." (Doc. 63 at 52) (emphasis omitted).

Yet the trial court never said Bryan could avoid a death sentence only if he proved the mitigating factors outweighed the aggravating factors. Rather, the court's question homed in on one basic corollary of the proposition that a death sentence was proper only if the jury found the aggravating circumstances outweighed the mitigating circumstance.

Even Bryan allows that, "as a practical matter, the circumstances the trial court described would mean that the state had *not* met its statutory burden of proving beyond a reasonable doubt that the aggravating circumstances outweighed the factors in mitigation, rendering a death sentence . . . legally forbidden." (Doc. 63 at 52-53) (emphasis in original).

Finally, Bryan makes much of the unfortunate circumstance that Juror McClellan's husband had been murdered. He argues that, given her husband's murder, McClellan would likely adhere to her belief, expressed earlier during voir dire, "that if a person takes a person's life, and they are found guilty beyond a reasonable doubt . . . they should get the death penalty." (Doc. 52 at 237).

The short answer is that the trial court, after conducting a thorough voir dire of McClellan, credited her testimony she would follow the law and vote for a lesser penalty if the aggravating circumstances did not outweigh the mitigating evidence.

In other words, while McClellan may have held an opinion that death was the only appropriate sanction for murder, the trial court believed her testimony she would set that opinion

33

aside and follow the law in fixing Bryan's sentence. On habeas review, I presume that credibility finding correct, 28 U.S.C. § 2254(e)(1), and Bryan has offered no evidence – let alone the required clear and convincing evidence – to overturn it.

For these reasons, the Ohio Supreme Court neither unreasonably applied the law nor unreasonably determined the facts in upholding the trial court's decision allowing McClellan to sit on the jury.

### C. For-Cause Removals of Veniremembers Hawkins and Bailey

In his third ground for relief, Bryan argues the trial court excluded veniremembers Hawkins and Bailey after erroneously determining they were biased against capital punishment.

### 1. Background

During voir dire, veniremember Matilda Hawkins testified she adhered to a philosophy of "thou shalt not kill. If we killed [Bryan], then we no better. Why not just let him repent maybe for life or something?" (Doc. 53 at 300).

When the court asked whether she could impose a death sentence if she found the aggravating circumstances to outweigh the mitigating evidence, Hawkins evaded the question, saying only that "I just don't want to be part of the killing." (*Id.* at 301).

Hawkins also characterized herself as "a religious person" (*id.* at 302), which prompted the prosecutor to explore whether her religious beliefs would prevent her from voting for a death sentence:

Mr. Zimmerman:     Okay. There's other people – some people may not be as strong in their faith. They may not read their bible or follow their faith as strongly, and they will say, "I can be a part of this jury."

34

However, some people are very strong in their faith and take their religion seriously. They couldn't be a part of this because their faith and their belief of what God has taught them is that you cannot take someone's life, and so they couldn't be a part of imposing the death penalty.

Are you a person like that?

I mean, is your faith that important to you, and your belief in God, that you could not be part of imposing the death penalty?

Ms. Hawkins:          I don't want to kill anyone.

Mr. Zimmerman:       You don't want to kill anyone. I understand that.

So because of your beliefs, does that mean you could not vote for a sentence of imposition of the death penalty?

Ms. Hawkins:          I don't want to.

Mr. Zimmerman:       You don't want to?

Ms. Hawkins:          No.

Mr. Zimmerman:       And you couldn't, could you?

Ms. Hawkins:          Not unless I had to.

*     *     *

Mr. Zimmerman:       Some people can't set aside their faith. They are too strong in their faith and belief to do that.

Are you a person like that?

Ms. Hawkins:          I don't want to do it.

Mr. Zimmerman:       I'm sorry?

Ms. Hawkins:          No.

35

| | |
|---|---|
| Mr. Zimmerman: | No, you cannot sign a verdict form imposing the death penalty? |
| Ms. Hawkins: | No. I don't want to sign nothing of the kind. |
| Mr. Zimmerman: | That would involve the death penalty? |
| Ms. Hawkins: | Right. |
| Mr. Zimmerman: | And that's because of your belief in God and what God has taught you? |
| Ms. Hawkins: | Well, I'm for punishment, but – |
| Mr. Zimmerman: | You would be for life in prison? |
| Ms. Hawkins: | Right, if you have gone that far. |
| Mr. Zimmerman: | But you couldn't impose the death penalty? |
| | Your Honor, may the record reflect the witness is shaking her head "no"? |
| The Court: | Yes. |

(Doc. 53 at 303-07).

Thereafter, in response to defense counsel's question whether Hawkins could follow the law even if she might disagree with it, Hawkins said, "Oh yes, I can [follow the law]." (*Id.* at 310).

Before Hawkins's voir dire concluded, she had a final exchange with the trial court:

| | |
|---|---|
| The Court: | Nonetheless, we have to ask. If you say – if you tell me, "Hey, Judge, I just don't know if I could do that," that's okay. |
| | If you say, "Hey, Judge, I can't do that," that's okay, too. Nobody is going to be down on you or give you a hard time. |
| | If you say you can do it – |
| Ms. Hawkins: | I'll say I don't know if I can do it. I'm willing to follow the law, but – |

36

| The Court: | You just don't know? |
| Ms. Hawkins: | I don't want to. |
| The Court: | Sign on the verdict form? |
| Ms. Hawkins: | Mm-hmm. |

(*Id.* at 317-20).

The trial court disqualified Hawkins, remarking that "I don't think that she can in good faith follow the law." (*Id.* at 320).

After excluding Hawkins, the trial court questioned veniremember Dorothy Bailey. Bailey initially denied being "morally, ethically or religiously opposed" to capital punishment (*id.* at 323) and agreed she could considering imposing a death sentence in Bryan's case.

During questioning by defense counsel, however, Bailey acknowledged stating on her juror questionnaire that she did "not support the death penalty and/or capital punishment[.]" (*Id.* at 324). When defense counsel asked whether her opposition to the death penalty extended to "all circumstances," Bailey – after "paus[ing] a long time" – said, "I really do believe I cannot support the death penalty." (*Id.* at 325).

In an effort to clarify Bailey's responses, defense counsel asked Bailey about a scenario where she "found that the aggravating circumstances did outweigh the mitigating factors by evidence beyond a reasonable doubt," and asked whether Bailey "[w]ould . . . go along with that." (*Id.* at 327).

Bailey's response was "I really don't know." (*Id.*).

During the prosecution's examination of Bailey, she expressed further misgivings about her ability to consider sentencing Bryan to death:

37

| | |
|---|---|
| Mr. Dever: | If it comes to that, that you evaluate this fairly and the aggravating circumstances outweigh mitigating factors, then the verdict form that you sign says the death penalty for this man right here. |
| | So the question I have for you is this: Can you do that? |
| Ms. Bailey: | I still feel that I would have a hard time. |
| Mr. Dever: | Okay. |
| | I hate to press you, okay, but there's – and either you can do it, you can't do it, or you don't know if you can do it. We have to get some statement from you, some declaration from you, Mrs. Bailey, as to whether or not you are able to do that. That's what we call "following the law." |
| Ms. Bailey: | I understand that. |
| Mr. Dever: | It's something you probably thought of many times over the years, but now we are right here, and this reality right now. |
| Ms. Bailey: | And, of course, I don't know what the terms here and here really will be. |
| Mr. Dever: | Right. I'm just saying to you that that will be explained to you, but there will be a calculation, a decision that will be made, where you weigh those two variables. |
| | The Judge will give you an instruction. He will tell you what the law is. He will tell you how to apply the law. Ultimately, though, you as the decision maker, with 11 other folks, are going to make that calculation. |
| | The law tells you that in making that calculation, if you determine the aggravating circumstances on this side outweigh the mitigating factors, then the verdict has to be death. |
| Ms. Bailey: | I do not support the death penalty. |
| Mr. Dever: | Okay. I'm not here to judge you or anything like that. I'm just here to get the answer to the question. |

|  | So as you sit here today, then, you could not follow the law; is that correct? |
|---|---|
| Ms. Bailey: | I guess that's how it translates. |
| Mr. Dever: | Is there anything about my questions that you did not understand? |
| Ms. Bailey: | I guess what I don't understand is, you know, how we got to three and four. I can understand the death penalty – |
| Mr. Dever: | Okay. |
| Ms. Bailey: | – but I did not understand how the aggravating circumstances would come out to three and four. |
| The Court: | Well, let me explain. If, for instance, the jury were to come to the conclusion after the second phase that the mitigation – that the evidence presented in mitigation really outweighed the aggravating circumstances of the case, okay, then they can say, "Yeah, Judge, we think in that case that life in prison without parole is an option, and we are for that" or "We are for life in prison with parole at 30 or life in prison with parole at 25." |

That would be a situation where the aggravating circumstances do not outweigh the mitigating factors. In other words, the mitigating factors are substantial, credible, believable. They are very, very predominant.

*   *   *

Our question is this: Ultimately – well, let's say this: Let's say that, for instance, you are deliberating and 11 of your fellow jurors agree that the aggravating circumstances outweigh the mitigating factors.

Let's say that you, in your heart, really feel that the aggravating circumstances outweigh the mitigating factors, but you recognize that if you join in with the other 11, it would result in the death sentence.

|  | Could you do it? |
|---|---|
|  | Let me pause and say that there's no right or wrong answer. There have been jurors here who have said, "No, I can't do it. I won't do it. It's not appropriate. It's not right. It's State sanctioned murder." |
|  | Now, you may have the moral high ground, so don't be hesitant to tell us exactly what is on your mind. |
| Ms. Bailey: | I would just have to think long and hard about it. |
| The Court: | Unfortunately, we need an answer right now. |
| Ms. Bailey. | I know. |
|  | I haven't heard the aggravating nor the mitigating circumstances? |
| The Court: | That's correct. |
| Ms. Bailey: | Well – |
| The Court: | So it's a theoretical question with very practical applications to the mitigation at hand, because there could eventually very well be be [*sic*] a situation where you are going to hear aggravating circumstances, and you will hear mitigation, and you will be asked to decide. Your decision, your one vote, it could very well result in a death penalty. |
|  | If that eventually were to occur, could you sign your name to a verdict form that would eventually sentence the defendant to death? |
| Ms. Bailey: | I doubt it. |

(*Id.* at 331-38).

After this exchange, the court removed Bailey over a defense objection.

40

## 2. State Court's Decision

On direct appeal, the Ohio Supreme Court upheld the trial court's removal of Hawkins and

Bailey:

> When Hawkins's and Bailey's answers are examined under the *Witt* standard, it is clear that the trial court did not abuse its discretion in excusing them for cause. Moreover, "'[t]he fact that the defense counsel was able to elicit somewhat contradictory viewpoints from these jurors during his examination does not, in and of itself, render the court's judgment erroneous.'" *State v. Beuke*, 38 Ohio St.3d at 38, 526 N.E.2d 274, quoting *State v. Scott* (1986), 26 Ohio St.3d 92, 98, 26 OBR 79, 497 N.E.2d 55. Further, "deference must be paid to the trial judge who sees and hears the juror." *Wainwright v. Witt*, 469 U.S. at 426, 105 S.Ct. 844, 83 L.Ed.2d 841.

*Bryan*, 101 Ohio St. 3d at 286.

## 3. Analysis

Bryan contends that decision was unreasonable because the trial court never made "the

factual finding . . . Hawkins was substantially impaired such that she could not follow the law."

(Doc. 63 at 62). He also emphasizes that even "the Ohio Supreme Court . . . found that 'Hawkins

was willing to follow the law[.]'" (*Id.*) (quoting *Bryan*, *supra*, 101 Ohio St. 3d at 286).

Regarding Bailey's removal, Bryan argues that, while Bailey testified she did not favor

capital punishment, she also testified she could follow the law. Bryan observes Bailey never said she

could not impose a death sentence, only that she would "have a hard time" doing so. (Doc. 63 at 64).

These arguments are insufficient to show the Ohio Supreme Court contradicted or

unreasonably applied federal law.

First, there is overwhelming evidence in the record that Hawkins's opposition to the death

penalty substantially impaired her ability to serve on the jury.

41

Time and again, Hawkins testified to her religious conviction that the death penalty was immoral. She also told the court and the parties she did not "want to be part of the killing" and did not "want to sign the death" verdict. (Doc. 53 at 299-300, 301, 304, 305).

Although the trial court did not expressly say it found Hawkins "substantially impaired," its statement that "I don't think that [Hawkins] can in good faith follow the law" (*Id.* at 320) adequately expressed its finding Hawkins was substantially impaired. *Uttecht*, *supra*, 551 U.S. at 7 ("Deference is owed regardless of whether the trial court engages in explicit analysis regarding substantial impairment; even the granting of a motion to excuse for cause constitutes an implicit finding of bias.").

Nothing in the Ohio Supreme Court's decision, moreover, supports Bryan's claim that that court "found" that Hawkins would consider sentencing Bryan to death. Rather, the court acknowledged Hawkins's testimony to that effect, but concluded the trial court had an adequate basis to reject it as incredible. *Bryan*, *supra*, 101 Ohio St. 3d at 286.

Second, veniremember Bailey repeatedly expressed her opposition to capital punishment, and she did so on one occasion after "pausing a long time" to consider whether her opposition was categorical. (Doc. 53 at 325). Pressed by the prosecutor for a clear answer whether she could follow the law by signing a death verdict if the evidence warranted that sentence, Bailey could not say yes; instead, she said "I do not support the death penalty."

The trial court gave Bailey another chance to say whether she could sign a death verdict in appropriate circumstances, but Bailey could only say "I doubt it." (*Id.* at 338).

42

Given Bailey's professed opposition to the death penalty and her inability to give a yes or no answer when asked whether, if the circumstances warranted it, she could vote for a death sentence, the trial court found Bailey could not follow the law.

The trial court was in the best position to determine whether, in view of Bailey's demeanor and the totality of her responses, Bailey could follow the law. *Witt*, *supra*, 469 U.S. at 430. Because there is ample evidence to support the trial court's decision that Bailey could not, and because I owe that decision great deference, *Uttecht*, *supra*, 551 U.S. at 7, I conclude the Ohio Supreme Court's decision affirming Bailey's dismissal was neither contrary to, nor an unreasonable application of, Supreme Court precedent.

### D. Misapplication of Ohio Law Governing For-Cause Challenges

Bryan next alleges the Ohio courts violated his liberty interest in having those courts apply the test established in *Witherspoon*, *supra*, – rather than the *Witt* test – in death-qualifying the jury.

He contends the Ohio General Assembly codified, in O.R.C. § 2945.25(C), the *Witherspoon* standard for excusing veniremembers based on their opposition to capital punishment. That codification, Bryan argues, gave him a liberty interest in having the state courts apply only the *Witherspoon* test – rather than the more relaxed standard announced in *Witt* – to determine which jurors were qualified to serve. And because the Ohio courts applied *Witt*, his argument concludes, the state courts deprived him of his protected liberty interest.

Bryan raised this argument on direct appeal, but the Ohio Supreme Court summarily rejected it on the basis of its decision in *State v. Rogers*, 17 Ohio St. 3d 174 (1985), *vacated on other grounds*, 474 U.S. 1002 (1985). *Bryan*, *supra*, 101 Ohio St. 3d at 286.

43

Bryan is not entitled to relief on this claim, primarily because his argument rests on the false premise that an Ohio trial judge cannot exclude a juror for cause under the *Witt* standard.

More than thirty years ago, in *Rogers*, *supra*, 17 Ohio St. 3d at 178, the Ohio Supreme Court held that "the *Witt* standard was applicable in Ohio through R.C. 2945.25(O)." *State v. Herring*, 2002 WL 33958156, *6 (Ohio App.).

Section 2945.25(O) permits a court to exclude a venire member who is "otherwise . . . unsuitable for any other cause to serve as a juror." O.R.C. § 2945.25(O). As the Ohio courts have explained, "[i]f a potential capital juror satisfies the *Witt* standard, that juror is *unsuitable* to serve a juror" and therefore removable in accordance with § 2945.25(O). *Herring*, *supra*, 2002 WL 33958156, at *6 (emphasis in original); *accord State v. Buell*, 22 Ohio St. 3d 124, 139 (1986) ("R.C. 2945.25(O) would allow, if found appropriate, a challenge for cause in such a case in light of *Wainwright*"); *State v. Adams*, 2011 WL 4923522, *45 (Ohio App.) (same).

For that reason, there is no merit to Bryan's claim the trial court violated his rights by using the *Witt* test to determine which veniremembers were qualified to sit on the jury.

### E. *Batson* Claim

Bryan next alleges the prosecution violated *Batson v. Kentucky*, 476 U.S. 79 (1986), when it used a peremptory strike to remove Crystal Jones, an African-American veniremember.

### 1. Mechanics of Jury Selection

Jury selection began on Monday, October 23, with a pool of one hundred prospective jurors. Before coming to court, each veniremember had filled out a lengthy, seventy-two-question questionnaire.

44

For the most part, questioning during the first round of voir dire focused on the veniremembers' opinions on the death penalty and their ability to follow the law that would apply at the penalty phase.

When the first round of voir dire concluded, at the close of business on Wednesday the 25th, the court and the parties had questioned seventy-three veniremembers. According to its tally, the court had: 1) excused seventeen veniremembers because of their views on the death penalty; 2) removed thirteen veniremembers for cause unrelated to the death penalty; and 3) excused one veniremember because of a medical condition.

The court was left with forty-two qualified veniremembers with which to impanel a jury. (Doc. 54 at 3-4, 151).

The second round of voir dire began on Thursday, October 26.

At this stage, the parties took turns addressing a panel of twelve veniremembers. After each side had had an opportunity to question the panel (the prosecution preferred to question each panel member individually, while the defense opted to question the whole panel at once and engage in a few exchanges with individual jurors), the court allowed both sides to make for-cause challenges to the panel members.

Thereafter, the parties took turns exercising peremptory strikes.

Whenever one side exercised a strike, the court called a new veniremember from the pool of qualified jurors to replace the stricken panel member. The court then gave the prosecution and defense a brief opportunity to question the new veniremember and challenge him or her for cause. If the parties passed the new veniremember for cause, the parties resumed exercising their peremptory strikes.

45

As the trial court noted, this method permitted the parties to see which veniremember "is coming up from" the pool of qualified veniremembers to take the place of a peremptorily challenged juror. (*Id.* at 152).

Each side could exercise up to six peremptory strikes. (Doc. 53 at 4).

### 2. First Removal of an African-American Veniremember

Odessa Williams, whom the parties and court referred to as "Juror No. 14" (because she was the fourteenth qualified veniremember the court accepted during the first round of voir dire) failed to report on time for the second round of voir dire.

When the court determined to strike Williams for not appearing, the defense did not object. (*Id.* at 176). At that juncture, the prosecutor pointed out that Williams was "an African-American individual." (*Id.* at 178). He continued:

> In the event there is a discussion about issues concerning Batson versus Kentucky, the record should reflect that the defense is the one who requested that she be excused for cause during the individual voir dire section and has [now] indicated that they have no objection at this time with her being removed because of her failure to be here[.]

(*Id.*).

### 3. Voir Dire of Crystal Jones

During the first round of voir dire, Jones testified she was "a little tired" after "sitting" during a "long" day at court. (Doc. 52 at 383). In response, the prosecutor acknowledged it had been "a long day for all of us." (*Id.*). Jones also testified she was a cousin of a former Prosecuting Attorney of Cuyahoga County, but that this relationship would not affect her impartiality.

46

When the questioning turned to the death penalty, Jones said she was not "religiously or ethically or morally opposed to" capital punishment. (*Id.* at 381). Rather, Jones "like[d] to believe that it's only imposed when the crime – the punishment should fit the crime." (*Id.* at 384).

Her exchange with the prosecutor continued:

Mr. Zimmerman:   Okay. Do you think it's appropriate for society to have the death penalty as a punishment?

Ms. Jones:       As long as there's some system in place that doesn't abuse that, yeah.

Mr. Zimmerman:   Do you think the system that's used by the United States does or does not abuse that?

Ms. Jones:       I would like to hope they are not abusing it.

(*Id.* at 384-85).

From there, Jones's voir dire proceeded unremarkably. She testified, *inter alia*, she would: 1) follow the law; 2) vote for a death sentence if she determined the aggravating factors outweighed the mitigating evidence; and 3) consider a sentence other than death if the prosecution did not satisfy its burden of proof at the penalty phase. (*Id.* at 387-388).

During the second round of voir dire, the prosecutor questioned Jones about a statement she had made on her juror questionnaire.

On that questionnaire, Jones wrote, in response to the question whether she believed "an African-American can receive a fair trial in our Criminal Justice System," that "if there isn't a system at all then the general public would take matters in their own hands ie. 'The Ox-Bow Incident.'" (Doc. 47 at 28). Jones had answered an earlier question about the fairness of the justice system

47

generally by stating "without this system – no one would have a chance! Their [*sic*] would be random justice or none at all." *Id.*

The prosecutor asked Jones about *The Ox-Bow Incident*:

Mr. Dever:     If I can recall correctly, that's when a lynch mob hung the wrong man.

               Is that essentially correct?

Ms. Jones:     That's correct.

Mr. Dever:     Because there was such a rush to judgment, such anger in a community about a senseless crime that the wrong person was picked, and before they realized what they had done, they had committed another crime by killing the wrong man, right?

Ms. Jones:     Right.

Mr. Dever:     That was a concern on your part, was it not?

Ms. Jones:     That's correct.

Mr. Dever:     You are familiar with this case and the amount of enormous emotion that has been generated in this community about this case, right?

Ms. Jones:     When I first heard about it.

Mr. Dever:     Okay. I mean, you have to be – well, you couldn't have been in Cleveland during June of this year and not known about this, right?

Ms. Jones:     Right.

Mr. Dever:     Now, everything that we have talked about, we have to ask ourselves to take a step back and say to ourselves that we, as a society, are governed by laws and by rules and by a general objective to find the truth. Okay?

               The truth knows no color. The truth knows no bias, no prejudice, anything like that. We have to call the facts as we see them.

               Fair enough?

| Ms. Jones: | Mm-hmm. |
|---|---|
| Mr. Dever: | In doing that, and in performing that calculation, you are going to have some emotional issues that you have to address for yourself to be at peace for what the decision is that you make. |
| | Are you willing to go through that type of an emotional roller coaster, I guess, for the lack of a better word to use, in arriving at the decision? |
| Ms. Jones: | Yes, I am. |
| Mr. Dever: | Okay. Now, we are way, way ahead of ourselves, but I'm saying to you, in evaluating the case and deciding the facts, it's just going to have to be the cold hard facts. |
| | Fair enough? |
| Ms. Jones: | Yes. |

(Doc. 54 at 269-272).

### 4. *Batson* Objection

The prosecutor had the right to exercise the first peremptory strike, and he used his strike to remove Jones. (*Id.* at 349). After using his second peremptory to remove a white veniremember, the prosecutor used his third strike to remove Reginald Flowers, another African-American veniremember. (*Id.* at 362, 372).

This prompted a *Batson* objection from the defense. Defense counsel argued that, although "there was a Caucasian juror who was challenged in the interim . . . it is our belief that those two jurors, the African-American jurors, were challenged as a result of their race." (*Id.* at 374).

Defense counsel also commented on the racial makeup of the venire.

49

He pointed out there were "only three blacks in the initial 12. Two of them have now been struck. So we are down to one African-American. And looking at the jurors who are coming up, your Honor, it appears that there probably won't be another African-American seated." (*Id.* at 374-75).

As the prosecutor started to explain why he struck Jones and Flowers, his partner objected there was no need to do so until the court found that Bryan made out a prima facie case. Nevertheless, the court asked the prosecutor to place his reasons on the record:

> The Court:    Well, look, I'm not prepared at this point – I understand where we are going. I have been paying close attention to the questions asked of these jurors. I can foresee that there was reasonable cause, non-racial reasons, to challenge these two black jurors you challenged. So I'm not willing at this point to make a prima facie finding.
>
> However, out of an abundance of caution, I'm going to ask the prosecution to place upon the record your reasons.
>
> *      *      *
>
> Mr. Dever:    As it relates to Juror No. 10, Mr. Reginald Flowers . . . Mr. Flowers, as we are all well-aware, after filling out the 72-question questionnaire, he has indicated that he, through his responsibilities as a corrections officer for the Cleveland City Jail, at a point in time, once the defendant was taken into custody by Cleveland police authorities, had responsibility over maintaining him as a prisoner, had an opportunity to observe him while he was incarcerated and these charges pending.
>
> In addition to that, Reginald Flowers has indicated that he participated in the funeral of Patrol Officer Wayne Leon, who is the named victim in the first three counts of the indictment. He indicated that was an emotional event, and he participated to the extent of being a member of the Color Guard.
>
> Now, this is troubling, that type of information, in that we were concerned out of an abundance of caution that Mr. Flowers is perhaps too close to this case to be fair and impartial, even if he might have been fair and impartial or more leaning to the authorities or to the

Cleveland Police officer who was killed by the way he paid respect to that man and to his family.

So that was the reason why the State of Ohio chose to excuse Mr. Flowers from participating on this jury.

As it relates to Crystal Jones, we had a chance through the course of the individually sequestered voir dire to make observations concerning her mannerisms and the way she responded to questions.

My observations yesterday were – or the day before yesterday when I believe she came in was that she was – had indicated that she was very inconvenienced by the whole process that had been taking place. She had been tired of being carted around.

Mr. Zimmerman:       Herded around.

Mr. Dever:       Herded around.

Her answers to the questions were generally in a "yes" or "no" fashion.

I detected in the way that she was answering the question that she was somewhat offended by the nature of the questions.

In the context of her questionnaire – and we would make this – ask this be part of the record, your Honor, so that a reviewing court may take a look at this particular juror and the rationale that the State used in excusing her – she made particular answers to questions concerning her qualifications to sit on this jury and her belief in the judicial system as being effective and fair.

She indicated – she did not answer the question directly as to whether or not the system is a fair process. She indicated that she would like to think that it was fair.

The other answers to her questions were – today I asked her a series of questions about an incident known as the Oxbow Incident, in which a lynching took place, in which an African-American was wrongfully accused in a horrendous crime in a community, and the community rushed to judgment and made a decision before evaluating all of the information, all of the evidence, and persecuted the wrong man, and that person was in fact hung.

51

She talked about that and that was a concern. We had an opportunity to talk with her about that as far as her viewpoints on this particular case.

The last thing that was disturbing to me was when Mr. Saffold asked this juror – asked all of the jurors whether they felt they were under a particularly enormous amount of pressure to return a certain verdict due to community beliefs or community views.

I had an opportunity to observe her response to that question, and she shook her head in an affirmative fashion, indicating that, yes, she was under an enormous amount of pressure.

Based upon those observations, your Honor, I believe that we have a neutral reason why we chose to ask Ms. Crystal Jones to be excused as well as to Reginald Flowers.

There has been no systemic attempt on the part of the prosecuting attorney or State of Ohio to exclude all members of the minority class.

Again, when it was asked to excuse Juror No. 14, who was late this morning and eventually did appear, but there was a motion made by the defense to have her excused, not only during the individual voir dire process, but also because of her lateness, and we objected. We brought to the Court's attention the concerns about the fact that she was an African-American. So we wanted to place it on the record.

We are sensitive and honor and respect the holding of Batson versus Kentucky and wanted to clearly indicate to the Court that there were reasons and rational [*sic*] that were used based upon criteria: Can this person be fair and impartial?

The Court:     Okay. I see no prima facie violation, and I see no evidence of racial – using these peremptory [*sic*] in a racially discriminatory fashion. If there's an objection, I overrule it. I note your objection for the record.

(*Id.* at 377-83).

### 5. Ohio Supreme Court's Decision

Bryan renewed his *Batson* claim on direct appeal,[4] but the Ohio Supreme Court held Bryan

failed to prove intentional discrimination:

> Bryan claims that the prosecutor peremptorily excused Crystal Jones, an African–American prospective juror, because of her race. See *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.

> "A court adjudicates a *Batson* claim in three steps." *State v. Murphy* (2001), 91 Ohio St.3d 516, 528, 747 N.E.2d 765. First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. *Batson*, 476 U.S. at 96-98, 106 S.Ct. 1712, 90 L.Ed.2d 69. However, the "explanation need not rise to the level justifying exercise of a challenge for cause." *Id.* at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69. Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination. *Id.* at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69. See, also, *Purkett v. Elem* (1995), 514 U.S. 765, 767–768, 115 S.Ct. 1769, 131 L.Ed.2d 834. A trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, following *Hernandez v. New York* (1991), 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395.

> Jones was peremptorily challenged without objection. Following the state's peremptory challenge of Reginald Flowers, another African–American, the defense claimed that both prospective jurors were improperly challenged because they were African-Americans. The trial court withheld its ruling on whether there was a prima facie case of racial discrimination until it had heard the state's response.

> The prosecutor provided several racially neutral reasons for peremptorily challenging Jones. The prosecutor noted Jones's reference in her juror questionnaire to The Ox–Bow Incident, a story involving a miscarriage of justice and the lynching of an innocent man. The prosecutor also mentioned that when jurors were asked whether they felt pressure to return a certain verdict due to community views, Jones responded by nodding her head in an affirmative fashion. Moreover, the prosecution stated that Jones indicated that she was very inconvenienced by the jury selection process and that her mannerisms showed that she was offended by the questions being asked. After hearing the prosecutor's explanation, the trial court rejected the

---

[4] Bryan conceded the strike against Flowers did not violate *Batson*.

*Batson* challenge, finding no prima facie case and no evidence of racial discrimination.

The facts support the trial court's decision. During voir dire, Jones discussed The Ox–Bow Incident and acknowledged her concern about a rush to judgment and a lynch-mob mentality. Furthermore, Jones's affirmative response about feeling community pressure to return a certain verdict provides another race-neutral explanation.

Despite his assertions, Bryan offers no evidence of discriminatory intent. The burden of proving intentional discrimination was his. Moreover, "[t]he trial court's finding is entitled to deference, since it turns largely 'on evaluation of credibility.'" *State v. White* (1999), 85 Ohio St.3d 433, 437, 709 N.E.2d 140, quoting *Batson*, 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69, fn. 21.

*Bryan*, *supra*, 101 Ohio St. 3d at 287-288.

## 6. Analysis

"*Batson* held that the Equal Protection Clause of the Fourteenth Amendment prohibits prosecutors from exercising peremptory challenges on the basis of race." *Davis v. Ayala*, — U.S. —, 135 S. Ct. 2187, 2199 (2015).

"When adjudicating a *Batson* claim, trial courts follow a three-step process." *Id.*

"First, the opponent of the peremptory strike must make a prima facie case that the challenged strike was based on race." *U.S. v. Lawrence*, 735 F.3d 385, 443 (6th Cir. 2013).

"The burden then shifts to the proponent of the peremptory strike to articulate a race-neutral explanation." *Id.*

"Finally the trial court must determine whether the opponent of the strike has proven purposeful discrimination." *Id.* "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice v. Collins*, 546 U.S. 333, 338 (2006).

"The critical question in determining whether a defendant has proved purposeful discrimination is the persuasiveness of the prosecutor's justification for his peremptory strike." *Braxton v. Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009) (internal quotation marks and ellipses omitted).

In determining the credibility of the prosecutor's explanation, a court may consider "the [proponent's] demeanor," "how reasonable, or improbable, the explanations are," and "whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).

"[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference" on direct appeal. *Hernandez v. New York*, 500 U.S. 352, 364 (1991). "Under AEDPA," however, "even more must be shown. A federal court must accept a state-court finding unless it was based on 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Ayala*, *supra*, 135 S. Ct. at 2199 (quoting 28 U.S.C. § 2254(d)).

### (a). Prima Facie Case

I first reject Bryan's claim the state trial court contradicted *Batson* by "fail[ing] to elaborate on why Bryan failed to present a prima facie case of racial discrimination." (Doc. 63 at 79).

As Bryan notes, the trial court did not decide whether the defense made a prima facie case before requiring the prosecutors to give reasons for their strikes of Jones and Flowers. But as the Supreme Court held in *Hernandez*, *supra*, 500 U.S. at 369, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate

question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot."

There is no dispute the prosecutor offered race-neutral reasons for the strikes, and the trial court ruled on the ultimate issue of purposeful discrimination. For that reason, there is no merit to Bryan's claim the state courts contradicted *Batson* in failing to decide whether the defense made out a prima facie of purposeful discrimination.

For the sake of completeness, I add there is no question Bryan made out a prima facie case.

First, like Jones and Flowers, Bryan is African-American.

Second, Officer Leon was white. (Doc. 37 at 412).

Third, as defense counsel noted, there were only three African-Americans in the initial twelve-person panel of veniremembers. Counsel also stated that, based upon the location of other African-Americans in the remaining pool of veniremembers, "it appears that there probably won't be another African-American seated." (Doc. 54 at 375).

Fourth, the prosecution exercised two of its first three peremptory challenges against African-Americans to exclude two-thirds of the available African-American veniremembers from the jury. The prosecution then waived its remaining peremptories. (Doc. 54 at 394).

Finally, there were no African-Americans on the jury. *Bryan*, *supra*, 101 Ohio. St. 3d at 288; (Doc. 31 at 271) (prosecution's direct-appeal brief recognizing lack of African-Americans on jury).[5]

---

[5] As best I can tell, eleven of the jurors were white and one was of Indian descent. (Doc. 53 at 287). It is unclear what happened to the third African-American veniremember in the original twelve-person panel.

For these reasons, Bryan made out a prima facie case. *E.g.*, *Moore v. Mitchell*, 708 F.3d 760, 802 (6th Cir. 2013) (petitioner made out prima facie case "because he and juror Freeman are both African-American").

### (b). Evidence of Racial Discrimination

Bryan alleges it was unreasonable for the state trial court to credit the prosecutor's race-neutral reasons for the strike, and for the Ohio Supreme Court to affirm that finding on appeal.

First, Bryan contends the prosecutor's reliance on Jones's demeanor – *i.e.*, that she appeared "offended" by certain of the prosecutor's questions, and allegedly viewed jury service as an inconvenience – is suspect.

He notes the trial court did not, after hearing the prosecutor's reasons, endorse them or engage in an on-the-record analysis of Jones's demeanor (let alone of how her demeanor compared with white veniremembers whom the prosecutor did not strike). Bryan further contends a comparison of Jones's responses with those of white juror shows that the white jurors, too, did not want to serve on the jury.

Second, Bryan contends the record refutes the prosecutor's claim that Jones's answers were "generally" yes-or-no type answers. Rather, Jones gave short, declarative answers only to questions that were leading or otherwise called for a yes-or-no answer. In that respect, Bryan continues, Jones's responses were no different from those of many whites on the jury.

Third, Bryan contends the prosecutor mischaracterized Jones's statements on her jury questionnaire when he claimed those responses demonstrated Jones believed the criminal justice system was unfair. In any event, Bryan notes the prosecutor did not object to the white jurors who expressed similar reservations about the fairness of the justice system.

57

Fourth, Bryan contends the prosecutor injected race into the equation when relying on Jones's statements about *The Ox-Bow Incident*.

On this point Bryan emphasizes that, while the prosecutor was explaining why Jones's feelings about that fictional work made her an unsuitable juror, the prosecutor erroneously contended *The Ox-Bow Incident* involved "an African-American [who] was wrongfully accused in a horrendous crime in a community[.]"

As Bryan points out, that film, and the novel on which it is based, involved the lynching of three innocent men, two of whom were white and one of whom was Mexican.

Bryan contends the prosecutor's mischaracterization of *The Ox-Bow Incident* revealed the prosecutor's belief that the work perturbed Jones, an African-American, because it involved a racial miscarriage of justice: the lynching of an innocent African-American by a group of whites bent on doing "justice" regardless of the truth. According to Bryan, however, Jones's race-neutral comments about *The Ox-Bow Incident* demonstrate only that she was concerned about miscarriages of justice, and the perils of rushing to judgment, in general and without regard to race.

Finally, Bryan asserts the prosecutor mischaracterized the record when he said Jones nodded affirmatively in response to a question whether "the jurors . . . felt they were under a particularly enormous amount of pressure to return a certain verdict due to community beliefs or community views."

That nod by Jones was unremarkable, Bryan contends, because it came in response to defense counsel's statement to the jury that "I think we can all kind of agree" that the members of the twelve-member panel felt a great deal of pressure about serving on the jury and returning a certain verdict.

Bryan also reiterates that feeling pressure was not uncommon among the white veniremembers whom the prosecutor did not strike.

For his part, the Warden neither acknowledges nor responds to any of Bryan's arguments.

Rather, after quoting from Jones's voir dire and the Ohio Supreme Court's decision, the Warden asserts "the trial judge viewed Jones and the prosecution . . . and found that there was no discriminatory intent." (Doc. 59 at 73-74).

The question is whether, given the evidence before the Ohio Supreme Court, its decision that Bryan failed to prove intentional discrimination was "based on an unreasonable determination of the facts[.]" 28 U.S.C. § 2254(d)(2).

In denying Bryan's claim, the Ohio Supreme Court found that Bryan "offer[ed] no evidence of discriminatory intent." *Bryan*, *supra*, 101 Ohio St. 3d at 288.

For the reasons set forth below, I conclude that finding lacks any reasonable basis in the record. On the contrary, the record contains a wealth of evidence establishing the prosecutor removed Jones because she was African-American.

### (1). *The Ox-Bow Incident*

One of the most significant pieces of evidence Bryan offered, and which neither the trial court nor the Supreme Court accounted for, was the prosecutor's belief that one of the innocent victims in *The Ox-Bow Incident* was African-American. (Doc. 54 at 381-83).

In citing Jones's comments about *The Ox-Bow Incident* as a basis for striking her, the prosecutor asserted that that work was about "a lynching" of "an African-American [who] was wrongfully accused . . . and persecuted . . . and . . . hung." (*Id.* at 382-83). According to the prosecutor, Jones "talked about that and that was a concern." (*Id.* at 382).

59

Although there is no dispute that the prosecutor's identification of the victim's race in *The Ox-Bow Incident* was incorrect, the reference to an African-American lynching victim would be probative evidence of discrimination even if the victim had been African-American.

This is so, because the prosecutor's statement directly and unilaterally injected a racial component into the equation, and one that was absent from Jones's race-neutral responses.

Taken on their own merits, Jones's comments about *The Ox-Bow Incident* reflect her concern about the impact community pressure can have on the fairness of the criminal justice system.

One can imagine how a reasonable prosecutor might have viewed with favor the kind of circumspection Jones expressed, as it may have led her to consider the evidence carefully and hew closely to the law. Viewed objectively, and in light of *The Ox-Bow Incident*'s actual scenario and themes as Jones appears to have understood them, her concerns reflect a desire simply to put the prosecution to its proof, and an intent to avoid the effects of public pressure in reaching a verdict.

But one can also imagine a prosecutor being suspicious of Jones, as her concerns with miscarriages of justice suggest she would have decided the case, not with an eye toward reaching the appropriate verdict in light of the evidence and the law, but by applying her own understanding of how to prevent a "miscarriage of justice."

Yet that was not the reason the prosecutor gave when citing *The Ox-Bow Incident* to justify the strike. Instead, the prosecutor referred to the "lynching" of an innocent "African-American," and claimed that "that was a concern" of Jones's. (Doc. 54 at 381).

This statement, which distorted Jones's actual responses, supports – at a minimum – a fair inference that, to the prosecutor's mind, *The Ox-Bow Incident* bothered Jones because it dealt with racial miscarriages of justice – among which lynching is of special resonance. And, the prosecutor's

60

comment implies, he believed Jones's concern with such race-based miscarriages of justice made her unable or unlikely, as an African-American sitting in judgment on another African-American accused of killing a white man, to decide the case on its merits.

The prosecutor's failure to recite the facts of *The Ox-Bow Incident* accurately, and his express reliance on the race of the victim in that fictional work to justify his strike of Jones, are significant, uncontested indicia that Jones's race played a role in his striking her from the jury.

### (2). Yes-or-No Answers

Also undermining the Ohio Supreme Court's judgment is the lack of record support for the prosecutor's claim that Jones "generally" answered questioned in a yes-or-no fashion. To the contrary, Jones gave appropriately detailed, non-yes-or-no to questions calling for such answers.

For example, some of the topics on which Jones did not confine herself to yes-or-no answers were:

- her opinion of the death penalty (Doc. 52 at 384);

- her rejection of an eye-for-an-eye philosophy (*id.* at 384-85);

- her willingness to follow the court's instructions (*id.* at 385-86);

- the questions she asked the prosecutor as to the propriety of voting for a death sentence (*id.* at 388);

- her qualified support of the death penalty (*id.* at 390);

- her willingness to hold prosecutors to their burden of proof (*id.* at 393);

- her familial ties to the former Prosecuting Attorney of Cuyahoga County (Doc. 54 at 267-68, 272); and

- the reasons why she had mentioned *The Ox-Bow Incident* in her juror questionnaire (*id.* at 269-70);

To be sure, Jones did answer "yes" or "no" to more than a few of the questions the court and counsel posed. But the majority those answers came in response to the prosecutor's leading questions, or questions that otherwise called for a yes-or-no answer. For example, Jones answered "yes," "correct," "that's right," or "no" to questions like:

- did she understand certain jury instructions (Doc. 52 at 380);

- was she philosophically opposed to the death penalty (*id.* at 381);

- would she automatically vote for a death sentence if the jury convicted Bryan (*id.*);

- had she formed an opinion about Bryan's guilt or innocence (*id.* at 382);

- did she understand what an aggravating factor was (*id.* at 386);

- would she consider imposing a sentence other than death if the evidence warranted such a sentence (*id.* at 388);

- was she related to a former Prosecuting Attorney of Cuyahoga County (Doc. 54 at 267);

- did she work for PPG (*id.* at 269);

- did the prosecutor correctly summarize the plot of *The Ox-Bow Incident* (*id.*);

- did she find the events depicted in *The Ox-Bow Incident* troubling (*id.* at 270);

- was she willing to participate in the "emotional roller coaster" that would be jury service in Bryan's case (*id.* at 271);

- would she decide the case based on the facts alone (*id.*); and

- did she know anyone whom the authorities had wrongfully accused and unduly punished (*id.*).

Finally, I note that, to the extent the prosecutor may have complained about Jones's yes-or-no answers during the second round of voir dire, the prosecutor himself was responsible, at least in part, for producing the cabined responses.

62

After asking Jones a handful of questions, the prosecutor told her "[y]ou are probably thinking I'm beating a dead horse with a lot of these questions and 'Let's move on.' I'll try to do that. I've got five minutes to cut to the c[h]ase." (Doc. 54 at 268). This was hardly a signal the prosecutor was interested in hearing Jones elaborate as she answered his questions.

For these reasons, there is no reasonable basis in the record for the prosecutor's claim Jones's answers were "generally" in a yes-or-no fashion. (Doc. 52 at 381).

### (3). Offensiveness of the Prosecutor's Questions

Although the prosecutor "detected in the way that [Jones] was answering the questions that she was somewhat offended by the nature of the questions," it is unclear from the record which questions he believed gave Jones offense. (Doc. 54 at 380). Nor, with only a cold record before me – and one that contains no contemporaneous analysis by the trial court or scrutiny of this issue by the Ohio Supreme Court– can I possibly verify Jones's reaction to that question or questions showed she was, in fact, offended.

I will therefore accept this reason as some slight evidence supporting the state courts' determination the prosecution did not remove Jones because of her race.

### (4). Similarity of Jones's Answers
### to Those of White Jurors

Furthermore, some of the grounds the prosecutor gave for excusing Jones apply equally to white venire members who sat on the jury.

*Yes-or-No Answers*. The occasions on which white jurors answered questions like Jones did – providing short, direct, yes-or-no answers when called to do so, and giving more detailed answers when appropriate – are too numerous to count. Suffice it to say nearly all white jurors gave answers

63

in this "generally" yes-or-no manner, and the prosecutor's reliance on that ground to excuse Jones was likely pretextual.

As the Supreme Court has explained, "[i]f a prosecutor's proffered reasons for striking a black panelist applies just as well to an otherwise similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination[.]" *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

*Fairness of the Criminal Justice System*. Another reason the prosecutor gave for excusing Jones was that certain statements on her questionnaire, and some of her answers during voir dire, suggested she did not believe the criminal justice system was fair.

As Bryan notes, Jones did not say in so many words that she thought the criminal justice system was unfair. But her answers about the fairness of the criminal justice system were qualified, at best.

Although she answered "yes" to the question whether a defendant can receive a fair trial, Jones added that, "without this system – no one would have a chance! Their [*sic*] would be random justice or none at all." (Doc. 47 at 28). And while Jones allowed that African-Americans can receive a fair trial, she appeared to qualify that opinion by saying, "Again, if there isn't a system at all then, the general public would take matters in their own hands ie. 'The Ox-Bow Incident.'" (*Id.*).

During voir dire, moreover, she did not directly answer the prosecutor's question whether there was a system in place to ensure fair, non-abusive use of the death penalty. Instead, Jones said she hoped such a system was in place.

These responses reflect qualified rather than wholehearted confidence in the fairness of the criminal justice system. The prosecutor could therefore properly, and sincerely, view these responses

as manifesting something less than complete confidence in the fairness of Cuyahoga County's justice system.

The problem, however, is that three whites who served on the jury expressed similar opinions.

Juror McClellan, for example, told the prosecutor that she believed that "[i]n some instances justice fails," and that "juries and the justice system" judge African-Americans differently than non-African-Americans. (Doc. 54 at 209-10).

On her questionnaire, Juror Cook answered the question whether she believed the justice system was fair by saying "I hope it works." (Doc. 48 at 61). Cook also stated that "a person can receive a fair trial" in the criminal justice system only "if the right jury is chosen." (*Id.* at 62).

Juror Schwartz, responding to the question what her opinion of the criminal justice system was, wrote that "[i]t doesn't always do the job but it is the best we have." (*Id.* at 95). Responding to the question whether African-Americans can receive a fair trial, Schwartz wrote that "[b]y all the Court standards and our laws I would hope that everyone gets a chance for a fair trial." (*Id.* at 96).

Despite this skepticism, the prosecution raised no objection to McClellan, Cook, or Schwartz serving on the jury. Accordingly, his satisfaction with white jurors who expressed qualified support for the criminal justice system, and his disapproval of Jones on the same ground, "is evidence tending to prove purposeful discrimination[.]" *Miller-El*, *supra*, 545 U.S. at 241.

*Inconvenience of Jury Service*. The prosecutor justified his strike of Jones, in part, because she stated during voir dire that she was "tired of being herded around" during voir dire. The prosecutor explained that he took that statement to mean Jones viewed jury service as an inconvenience.

But there was no meaningful difference between Jones's comments and those of Jurors Cook and Schwartz two white veniremembers who served on the jury, neither of whom were pleased to be serving on the jury.

Juror Schwartz, for example, testified during voir dire that she did not like sitting in the jury box, and that she felt "the tension" there. (Doc. 53 at 98-99).

Likewise, Juror Cook agreed with the prosecutor when he asked whether it was "a tough situation you are in right now." (*Id.* at 72). Then, when defense counsel asked Cook how she was "doing today," Cook responded she was merely "fair." (*Id.*). Finally, when defense counsel asked whether Cook wanted to serve on the jury, she said, "I don't think so." (*Id.* at 78).

Because two white jurors expressed their reluctance to serve on the jury – and did so at least as explicitly as Jones had – the prosecutor's reliance on that ground to remove Jones smacks of pretext. *Miller-El*, *supra*, 545 U.S. at 241.

*Rush to Judgment*. Like Jones, Juror McClellan acknowledged that social pressure on juries to convict concerned her. During the second round of voir dire, defense counsel said:

| | |
|---|---|
| Mr. Saffold: | I have a concern . . . that we have a society who is so anxious to convict that they even get upset when sometimes a jury doesn't [convict], and they can hardly even craft a story about an innocent guy. |
| | Does that concern you? |
| Ms. McClellan: | Yes. |
| Mr. Saffold: | * * * Do you agree that's a problem? |
| Ms. McClellan: | Yes. |
| Mr. Saffold: | I have the craziest notion: What is Quisi Bryan is not guilty of aggravated murder? |

(Doc. 54 at 314-15).

Although both Jones and McClellan expressed a concern about rushing to judgments and pressure to convict, the prosecutor struck only Jones.

*Pressure to Return a Certain Verdict*. Finally, the prosecutor cited Jones's affirmative nod when she was asked if she felt pressure to return a certain verdict as a basis for striking her. The nod at issue came in response to this statement from defense counsel during the second round of voir dire:

> Mr. Saffold:   Okay. I don't want to talk to you about pretrial publicity because we did that with everybody essentially in the first phase, that sort of, as I referred to it, quasi voir dire, the death penalty qualifying process. I'm not going to spend time with you talking about pretrial publicity, but I do want to talk to you about the concept that kind of plays into that. We have already sort of touched on it.
>
> I think we all kind of agree that there's a lot of pressure on a jury to convict.
>
> Do you agree with that concept or no?

(Doc. 54 at 320).

After telling the panel "you don't always have to nod" (*id.*), defense counsel had an exchange with two veniremembers, Todd and Watson, who had demurred to counsel's statement. But Watson, who served on the jury (Doc. 44 at 7) immediately thereafter agreed with Bryan's lawyer that he could see that "in some cases there may be pressure" on a jury to convict. (Doc. 54 at 321).

Addressing the entire twelve-person panel, defense counsel continued:

> Mr. Saffold:   Part of [your oath] is to disregard any pressure that you may feel in either direction.
>
> Are we all in agreement on that?

> Remember, if not, it's fine to shake your head.
>
> Are we all in agreement on that?

(*Id.* at 32).

The only reasonable reading of this exchange is that, after Jones had nodded to acknowledge there is often pressure on juries, in general – and not specifically in this case – to convict, she also nodded – or at least did not demur – when defense counsel asked whether the panelists could set aside any such pressure they might feel.

Moreover, four other white jurors – McClellan, Gorsuch, Eisner, and Barry (Doc. 44 at 7) – were members of the panel to whom defense counsel posed these questions. That none openly demurred or gave defense counsel any indication but that they would set aside whatever pressure they might feel to reach a certain verdict in deciding Bryan's fate undermines the legitimacy of the prosecutor's explanation.

Finally, this component of the prosecutor's explanation highlights the importance of the Sixth Circuit's admonition in *Braxton*, *supra*, 561 F.3d at 461, that "when the purported race-neutral justification is predicated on subjective explanations like body language or demeanor, an on-the-record analysis of each of the elements of a *Batson* challenge is especially important."

But the state trial court failed to conduct such an analysis, and the prosecutor did not use follow-up questions to clarify whether Jones would be able to set aside any improper pressure she might have felt to return a guilty verdict in Bryan's case. *Miller-El*, *supra*, 545 U.S. at 246 ("the State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination").

### (5). Conclusion

Having considered the totality of the evidence supporting and undermining the grounds for the prosecutor's strike, and mindful of my fundamental duty to defer, whenever it is reasonable to do so, to the state trial court who presided over voir dire, I conclude the Ohio Supreme Court's rejection of Bryan's *Batson* claim represents an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Most importantly, the prosecutor injected a racial component into what were otherwise race-neutral concerns Jones had expressed about rushes to judgment and miscarriages of justice.

Rather than taking her answers at face value, the prosecutor claimed that had what concerned Jones about *The Ox-Bow Incident* was the "lynching" of an innocent "African American." As already noted, this evidence supports the inference the prosecutor did not trust Jones to view the evidence fairly because, as an African-American, she was particularly concerned about perpetrating a racial miscarriage of justice against Bryan, another African-American.

Second, four of the bases the prosecutor cited for removing Jones – her yes-or-no answers, the supposed inconvenience to her of serving on the jury, her skepticism about the fairness of the criminal justice system, and the pressure on juries to return a certain verdict – applied equally to white jurors to whom the prosecutor raised no objection.

Third, while Jones may have nodded to indicate there was pressure on juries generally to convict, the record also shows she apparently agreed to set aside and ignore that pressure. In any event, the absence of a contemporaneous, on-the-record analysis of this demeanor-based reason for striking Jones casts even more doubt on the credibility and reliability of the prosecutor's reasons for striking Jones.

69

Given this evidence, a reasonable judge simply could not conclude Bryan failed to prove intentional discrimination. While I must pay great deference to the trial court's finding the prosecutor exercised the strike for race-neutral reasons, in the end there is no evidence on which to base that finding. The evidence points clearly and convincingly to the conclusion the prosecutor struck Jones because she was African-American. 28 U.S.C. § 2254(e)(1).

Because the Ohio Supreme Court's judgment rests on an unreasonable determination of the facts, Bryan is entitled to habeas relief.

## F. Prosecutorial Misconduct at the Guilt Phase

Bryan next alleges prosecutorial misconduct at the guilt phase denied him a fair trial.

He contends the prosecutor erred by: 1) impeaching him with the facts underlying his prior conviction for attempted robbery; 2) inviting the jury, during summation, to base its verdict on sympathy for Officer Leon and his survivors; and 3) characterized Bryan's defense as revolving around the claim Bryan had "accidentally" shot Leon.

The Warden disputes the merits of these allegations. He also contends Bryan failed to argue on direct appeal that the prosecutor improperly called the defense theory an accident, and thus procedurally defaulted that part of his claim.

### 1. Procedural Default

A habeas petitioner "may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state court's ordinary appellate review procedures." *Carter v. Mitchell*, 693 F.3d 555, 563 (6th Cir. 2012). A habeas court may not review a defaulted claim absent a showing of cause and prejudice, or that failing to review the claim will result in a fundamental miscarriage of justice. *Wallace v. Sexton*, 570 F. App'x 443, 452 (6th Cir. 2014).

Here, the record shows Bryan did not argue on direct appeal that the prosecutor mischaracterized the defense theory as an "accident" during closing argument.

Because Bryan did not present that component of his prosecutorial-misconduct claim to the state courts, and because he does not present any basis on which I could excuse the default, this part of his claim is procedurally defaulted.

## 2. Merits

To prevail on a claim of prosecutorial misconduct, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned[;]" rather, "the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

"[T]o satisfy the standard for prosecutorial misconduct, the conduct must be both improper and flagrant." *Goff v. Bagley*, 601 F.3d 445, 480 (6th Cir. 2010).

In deciding whether any misconduct was flagrant, I consider: 1) the likelihood the prosecutor's remarks misled the jury; 2) whether the remarks were isolated or extensive; 3) whether the remarks were deliberately or accidentally made; and 4) the total strength of the evidence against the defendant. *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith*, *supra*, 455 U.S. at 219.

### (a). State Court's Decision

On direct appeal, the Ohio Supreme Court rejected Bryan's claim of prosecutorial misconduct:

71

First, Bryan complains that the prosecutor improperly cross-examined him about the details of a prior robbery conviction. During the state's case, the parties stipulated that Bryan had been convicted of attempted robbery on January 31, 1995, and was sentenced to two to ten years in prison. During the defense case, Bryan testified that he had been convicted of attempted robbery and of receiving stolen property, and twice for carrying a concealed weapon.

Bryan argues that the prosecutor improperly cross-examined him about the underlying facts of the robbery conviction when the prosecutor, over objection, referred to the attempted robbery as a "car jacking," questioned whether the defendant "put a .38 against somebody's head and dragged them out of their car," and asked whether Bryan "threaten[ed] to shoot this person if they didn't give up their car." Furthermore, Bryan claims that the prosecutor improperly elicited details about the conviction by asking Bryan, over objection, to tell the jury "about this car jacking."

When an accused testifies at trial, Evid.R. 609(A)(2) allows the state to impeach the accused's credibility with evidence that the accused was convicted of an offense punishable by imprisonment in excess of one year and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Generally, a prosecutor can cross-examine as to "'the name of the crime, the time and place of conviction, and sometimes the punishment.'" However, "'details such as the victim's name and the aggravating circumstances'" are not permissible. 1 Giannelli & Snyder, Evidence (2d Ed.2001), Section 609.15, at 473, quoting 1 McCormick (5th Ed.1999), Section 42, at 167. Nevertheless, the trial court "has broad discretion in determining the extent to which testimony will be admitted under Evid.R. 609." *State v. Wright* (1990), 48 Ohio St.3d 5, 548 N.E.2d 923, syllabus; see, also, *State v. Amburgey* (1987), 33 Ohio St.3d 115, 117, 515 N.E.2d 925.

At trial, the prosecutor extensively questioned Bryan about the underlying facts of his robbery conviction. Such questioning exceeded permissible cross-examination of a defendant about the details of a prior conviction. Cf. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 150–151 (questions concerning prior murder conviction that involved shooting the victim "with a gun" and "in the heart" were not prosecutorial misconduct); *State v. Taylor* (1997), 78 Ohio St.3d 15, 26, 676 N.E.2d 82 (brief questioning clarifying that prior murder conviction was for two murders permissible).

In this case, however, the prosecutor's misconduct in questioning Bryan is not reversible error. Here, Bryan's conviction for attempted robbery had been properly admitted into evidence, and further questioning about the facts of that conviction was

72

harmless in view of the overwhelming evidence of his guilt. See *State v. Williams* (1988), 38 Ohio St.3d 346, 351, 528 N.E.2d 910.

*   *   *

Bryan also claims that the prosecutor improperly commented on the victim and his family and appealed to the community's sense of outrage during the state's closing argument. However, the defense failed to object and waived all but plain error. See *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

During closing argument, the prosecutor commented about the victim, his family, and community responsibility:

[W]hen this case is just a memory to you, ladies and gentleman, Officer Leon's small children will go on a journey of their own to find out what kind of a father they had. And ultimately that journey will take them here to this courtroom.

Ultimately, ladies and gentlemen, their mother, their grandfather, their uncles, their friends, their colleagues will all say something about who Wayne Leon was but ultimately it will be your decision * * * that will define Wayne Leon.

In the years that I've been doing this, * * * I have been blessed with the opportunity to try homicide cases, a blessing because you get to observe people who are the tragic witnesses of very, very tragic events, family members.

And you wonder how can they possibly go on? How could they possibly get through the day? They've been left with nothing, devastated. Well, that's a blessing * * * that we have been able to witness through this case.

It's that a community has come together so that the accounting for what has occurred to Wayne Leon will not go unnoticed. So that his children, when they go on the journey to discover who their father was, that they will know that he was a brave man, that he protected the community * * *.

"I want to leave you with something as far as an old poem, an old writing. I always think that in the hour of death you should look to the

73

person, the victim of the crime, and learn what * * * type of a devastating loss this has been.

"He has lived a beautiful life and has left a beautiful field. He has sacrificed the hour to give service for all time. He has entered the company of the great and with them he will be remembered forever."

In closing, the prosecutor added, "Let Wayne Leon's children know that when you returned your verdict, * * * that you made a search for the truth. That you had faith in the law and that, most importantly, you had faith in yourselves that you, in fact, would do the right thing here, and that would be to find justice so that they can be comforted by the fact that there is recourse to the law, that there is an accounting for the senseless killing and that their father will be remembered as a hero and not just some incidental blip on the radar screen because Quisi Bryan was having a bad day."

The test for prosecutorial misconduct in closing arguments is "'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Hessler*, 90 Ohio St.3d at 125, 734 N.E.2d 1237, quoting *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. In applying this test, we consider "the effect the misconduct had on the jury in the context of the entire trial." *State v. Keenan* (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203.

Here, the prosecutor appealed for the jury to deliver a verdict that would search for the truth and had faith in the law. These comments do not prejudicially affect the substantive rights of Bryan in this case in view of the overwhelming evidence of his guilt. See *State v. DePew* (1988), 38 Ohio St.3d 275, 288–289, 528 N.E.2d 542 (prosecutorial misconduct not reversible when evidence of guilt is overwhelming; however, prosecutor's misconduct warranted referral to Disciplinary Counsel); *State v. Grant* (1993), 67 Ohio St.3d 465, 484, 620 N.E.2d 50 (prosecutor's reference to the jury as the "conscience of the community" was not plain error); but, cf., *State v. Keenan*, 66 Ohio St.3d at 411, 613 N.E.2d 203 (protracted improper arguments resulted in prejudicial error where evidence was not overwhelming).

*Bryan*, *supra*, 101 Ohio St. 3d at 291-292, 293-294.

### (b). Improper Impeachment

First, it was reasonable for the Ohio Supreme Court to conclude that "the prosecutor's misconduct . . . was harmless in view of the overwhelming evidence of his guilt." *Bryan*, *supra*, 101 Ohio St. 3d at 292.

The court recognized the prosecutor had flouted basic tenets of Ohio evidence law, and did so repeatedly. Bryan has therefore carried his burden of showing the prosecutor's action were improper.

But Bryan had to do more than highlight the prosecutor's wrongdoing; he had to show how the misconduct affected the integrity of the trial. He has failed to do so.

The line of questioning to which Bryan objects – though it contains multiple and seemingly deliberate instances of improper questioning – was brief, comprising only three pages of a trial transcript than runs to more than 3,300 pages.

Moreover, as the Ohio Supreme Court reasonably concluded, the evidence of Bryan's guilt was indeed overwhelming.

The record shows that Officer Leon parked his patrol car behind Bryan's vehicle at the Sunoco gas station. At the time, Bryan knew there were outstanding warrants for his arrest, both for violating the parole term attached to his attempted-robbery conviction and on charges of theft and receiving stolen property in Euclid, Ohio.

Bryan, unlawfully armed with a .45 caliber Glock pistol, got out of his car and met Officer Leon near the rear of the car.

The officer asked whether Bryan knew the temporary license tags on his car had expired; Bryan knew the tags were "fictitious," but he did not respond. (Doc. 57 at 449, 451). After Officer

75

Leon took a closer look at the tags and recognized them as "fictitious." (*Id.* at 452). He then asked to see Bryan's driver's license, but Bryan told him he did not have it with him.

The officer started to reach for his police radio to call in a check on Bryan's license. That is when, Bryan testified, he pulled out his gun, pointed it at Leon's face, and told Leon, "Don't do that." (*Id.* at 458). Bryan admitted that "if [Leon] went to his mike, he was going to ultimately find out who I was." (*Id.*).

At that point – again, according to Bryan's own testimony – Officer Leon stepped back and reached for his own gun. Bryan immediately fired his gun into Leon's face, killing him. Bryan fled the scene, driving recklessly and at a high rate of speed. He exchanged gunfire with Kenneth Niedhammer, an off-duty security guard who had heard the shooting and was trying to apprehend Bryan

Bryan did not dispute any of this evidence. The only question the jury had to decide was whether Bryan acted intentionally.

His testimony – that he knew about the pending warrants, that Officer Leon would discover who he was if he made the call on his police radio, and that he did not want to go back to prison — all but compelled the jury to find Bryan committed intentional murder, not involuntary manslaughter.

Finally, Bryan's manslaughter defense was hardly convincing. After all, it asked the jury to find he had not acted intentionally, even though he had pulled a gun on Leon, tried to use it to coerce Leon not to perform a lawful function of his office, and fired it when Leon reached for his own weapon.

In these circumstances, I  conclude the prosecutor's improper remarks posed absolutely no danger of misleading the jury in its evaluation of the evidence. Accordingly, the Ohio Supreme Court

76

did not unreasonably apply Supreme Court precedent in rejecting Bryan's claim the prosecutor improperly impeached him.

### (c). Improper Closing Argument

The Ohio Supreme Court ruled the prosecutor's closing argument did not "prejudicially affect the substantive rights of Bryan in this case in view of the overwhelming evidence of his guilt." *Bryan*, *supra*, 101 Ohio St. 3d at 294.

It is unclear from that passage whether the court concluded the prosecutor's remarks were proper. If so, that would have been an unreasonable application of *Darden* and like cases.

The Ohio Supreme Court characterized the prosecutor's argument as an appeal "for the jury to deliver a verdict that would search for the truth and had faith in the law," which suggests the court may have concluded the argument was within the bounds of fair comment. *Id.* at 293.

While the court's description may have been accurate as to some of the prosecutor's remarks, it does not account for the prosecutor's blatant appeals to the jury's sympathy for Officer Leon's survivors.

Specifically, the prosecutor invited the jury to consider that "Officer Leon's small children will go on a journey of their own to find out what kind of a father they had," and reminded the jury that "that journey will take them [*i.e.*, Leon's children] here to this courtroom." *Id.* He then asked the jurors to sympathize with Leon's family members, all of whom had "been left with nothing, devastated." *Id.*

The prosecutor also suggested the jury should return a verdict that would "[l]et Wayne Leon's children know" that "there is an accounting for the senseless killing and that their father will be remembered as a hero[.]" *Id.* at 294.

77

These comments had little to do with what the state court called a "search for truth," and much to do with inciting passions against Bryan. Indeed, the Ohio Supreme Court held that similar arguments by the prosecutor during the penalty phase were improper. *Id.* at 299.

Nevertheless, I conclude the state court's further determination – that the argument was not prejudicial, given the substantial evidence of guilt – was reasonable.

Although some of the prosecutor's remarks were deliberate – they were a prelude to a "poem" the prosecutor had memorized and recited – they were but a small piece of the prosecutor's lengthy argument, the vast majority of which focused on the substantial evidence of Bryan's guilt. Moreover, the trial court instructed the jury that the attorneys' arguments were not evidence, and, as discussed above, the evidence against Bryan was overwhelming.

I conclude the Ohio Supreme Court's bottom-line judgment on this issue was not contrary to, or an unreasonable application of, federal law.

### G. Prosecutorial Misconduct at the Penalty Phase

In ground seven, Bryan alleges the prosecutor engaged in further misconduct during the penalty phase.

Bryan claims the prosecutor: 1) urged the jury to impose the death penalty to protect the community, satisfy community outrage, deter future killings, and protect policemen; 2) argued that the lack of mitigating circumstances surrounding the murder was, in fact, an aggravating circumstance; and 3) emphasized the effect of the murders on Officer Leon's survivors.

The Ohio Supreme Court rejected this claim[6]:

---

[6] The state court invoked procedural bars to reject many parts of this claim, but the Warden has not raised, and has thus forfeited, a procedural-default defense. *Baze*, *supra*, 370 F.3d at 321.

78

Bryan argues that the prosecutor committed misconduct throughout the penalty-phase closing argument. However, unless noted, the defense did not object to the purported acts of prosecutorial misconduct and thus waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916.

First, Bryan argues that the prosecutor improperly referred to him as a "running time-bomb ready to go off." However, this description is within the realm of fair comment. See *State v. Nields* (2001), 93 Ohio St.3d 6, 37, 752 N.E.2d 859 ("mean-spirited derelict" and "unemployed killer" as fair comment); *State v. Clemons* (1998), 82 Ohio St.3d 438, 451, 696 N.E.2d 1009 ("cowardly" permissible).

Second, Bryan argues that the prosecutor improperly referred to the R.C. 2929.04(A)(5) specification as the "mass murder" specification. The prosecutor's comment did not result in plain error, but counsel should have referred to the R.C. 2929.04(A)(5) specification as the "course of conduct" specification.

Third, Bryan cites *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, and argues that the prosecutor's argument treated the nature and circumstances of the offenses as an aggravating circumstance. The prosecutor properly stated that the jury decides whether "anything in the nature and circumstances [of the offense] should be considered mitigation." The prosecutor then reviewed key facts of the offense and, through a series of rhetorical questions (e.g., "do you see mitigation there"?), argued that the nature and circumstances of the offense presented little or no mitigation.

"Although, according to *Wogenstahl*, * * * prosecutors cannot argue that the nature and circumstances of an offense are aggravating circumstances, the facts and circumstances of the offense must be examined to determine whether they are mitigating. R.C. 2929.04(B). Thus, a prosecutor may legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance[s] outweigh mitigating factors." *State v. Sheppard* (1998), 84 Ohio St.3d 230, 238, 703 N.E.2d 286. Here, the prosecutor neither characterized nor labeled any of the facts of the offense as aggravating circumstances. Rather, the prosecutor properly argued that the nature and circumstances of the offense were not mitigating.

\* \* \*

Fourth, Bryan argues that the prosecutor committed misconduct by arguing victim impact and urging the death penalty to satisfy community outrage. "A prosecutor may not call for the jury to convict in response to public demand." *State v. Hicks* (1989), 43 Ohio St.3d 72, 76, 538 N.E.2d 1030. Here is how the prosecutor, over defense objection, argued against any juror's inclination to fail to return a death

79

sentence: "[Y]ou are telling the ladies and gentlemen of this community, when this is published in the paper, or when you get a chance to read this, about what your verdict is * * * that it's okay to shoot a policeman now." Such argument improperly suggested that the jury could consider the response of public opinion when voting on the sentence. Similarly, we find that the prosecutor committed misconduct when arguing that "because there's community outrage doesn't necessarily mean that the community is wrong about calling for the ultimate punishment" and that the jury has "to send out the message * * * that the ultimate penalty should be applied."

We also find that the prosecutor improperly commented on the testimony of Bryan's mother when arguing, "Everybody has a mom. I'm sure Wayne Leon had a mom. I'm sure that Wayne Leon's children ask their mom, 'Where is daddy?'" Such emotionally charged comments did not properly rebut any mitigating evidence or previous defense arguments. However, we find no plain error in view of the proven aggravating circumstances and the lack of significant mitigating evidence. Moreover, our independent assessment of the sentence has cured any lingering impact from the prosecutor's comments. *State v. Hartman* (2001), 93 Ohio St.3d 274, 295, 754 N.E.2d 1150.

We also reject Bryan's claim of prosecutorial misconduct during other segments of the state's argument. The prosecutor's explanation that shooting a police officer is an aggravating circumstance to "preserve the public tranquility" represented fair comment. Moreover, the prosecutor committed no misconduct when arguing that "if this case is not the case that calls for the death penalty, then which one does?" Here, the prosecutor's comments were within the creative latitude accorded both parties. *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523; *State v. Nields*, 93 Ohio St.3d at 39, 752 N.E.2d 859. Bryan's actions in coldbloodedly discharging a .45 caliber semiautomatic Glock into the face of an investigating uniformed police officer precipitated the events and provided the basis of these arguments. He cannot expect less in these situations.

Contrary to Bryan's claim, the prosecutor did not commit misconduct in arguing, "Is it remorse of sincerity because of the * * * horrible tragedy that he has caused here, that he has destroyed a family, that he has harmed a community, or is it remorse because of his own personal predicament?" Here, the prosecutor's comment was fair rebuttal to defense argument that Bryan had "absolutely, positively" shown remorse.

The prosecutor also did not commit misconduct in arguing, "He will tell you or say * * * anything in order to protect himself so that he can survive * * *; so that he can tell the story in the prison about killing a cop, beating the rap, swindling a jury into thinking that he has some remorse * * *." Again, the prosecutor's remarks were fair rebuttal to the defense argument that, if given a life sentence, Bryan could teach

other prisoners to "make different decisions than he made." See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 178.

Moreover, the prosecutor's argument that Bryan was "packing all of these guns around and trying to perpetuate an image to his girlfriend, Janie Winston, that he is a true thug, a gangster, from the gold chains to the lifestyle of an outlaw" represented fair comment on the evidence. We also dismiss Bryan's argument that the prosecutor erred by referring to the verdict as a recommendation. See *State v. Durr* (1991), 58 Ohio St.3d 86, 93, 568 N.E.2d 674.

Finally, we reject Bryan's argument that the prosecutor's cumulative misconduct deprived him of a fair trial. *State v. Landrum*, 53 Ohio St.3d at 113, 559 N.E.2d 710.

*Bryan*, *supra*, 101 Ohio St. 3d at 297-300.

At first blush, Bryan's argument, which focuses on certain pieces of the prosecutor's argument, has much appeal. It suggests the prosecutor devoted his entire argument at the penalty phase to inflaming the jury's passion, rather than appealing for a reasoned and impartial assessment of the asserted grounds for a capital verdict.

But after reading the prosecutor's argument in its entirety, I concur in the Ohio Supreme Court's thorough – and reasonable – determinations that much of the prosecutor's argument was proper, and those parts that exceeded the boundaries of fair comment were not prejudicial.

First, as that court noted, the prosecutor's reference to Bryan as a "running time-bomb" was a fair comment on the evidence.

There were multiple warrants for Bryan's arrest pending at the time of the murder, Bryan believed the authorities were after him, and the jury heard Bryan's statement to his girlfriend Janie Winston, that he would submit to the authorities only on his own terms. That permitted the prosecutor to argue that Bryan was a potential danger to anyone who encountered him. The time-bomb metaphor was, under the circumstances, apt.

81

Second, the record refutes Bryan's claim the prosecutor argued that the lack of mitigating evidence surrounding Bryan's crimes counted as an aggravating factor.

At the penalty phase, the prosecutor need not limit his arguments in support of a capital verdict to aggravating factors; he may also highlight the lack of mitigating evidence. This is what the prosecutor did in going through the circumstances surrounding Bryan's crimes and asking the jury whether there was anything mitigating about them.

In any event, the record shows defense counsel had a full and fair opportunity to argue there was, in fact, some mitigating evidence in the crimes themselves (he pointed, for example, to the jury's acquittal of Bryan on the aggravated-murder count alleging he killed Officer Leon with prior calculation and design as some mitigating evidence).

Accordingly, even if the Ohio Supreme Court had unreasonably determined this part of the prosecutor's closing was proper, Bryan suffered no prejudice.

Third, the prosecutor acted appropriately in asking the jury to consider whether Bryan's expression of remorse – introduced *via* his unsworn statement – truly reflected remorse for the killing or simply regret for the predicament Bryan found himself in. This was a direct answer to "the defense argument that Bryan had 'absolutely, positively' shown remorse." *Bryan*, 101 Ohio St. 3d at 300.

Fourth, the prosecutor's use of the term "swindle" in reference to the implausibility of the manslaughter defense approached the borderline of fair comment, as it cast doubt, and unfairly so, on the professionalism of defense counsel. But the thrust of that argument was proper, for the reasons, quoted above, in the Ohio Supreme Court's opinion.

Finally, I agree with the Ohio Supreme Court that the prosecutor engaged in an entirely improper argument in urging the jury to sentence Bryan to death because: 1) any other sentence would tell the community "it's okay to shoot a policeman now"; 2) the community demanded that penalty; and 3) Bryan's mitigation evidence, from his mother Cassandra, was entitled to no weight because, like Bryan, "Wayne Leon had a mom" and "I'm sure that Wayne Leon's children ask their mom, 'Where is daddy?'"

Why the prosecutor stooped to such heavy-handed and improper tactics defies explanation, given the strength of the evidence in aggravation and the unambiguous legal prohibitions against such arguments. As the Ohio Supreme Court accurately stated: "Such emotionally charged comments did not properly rebut any mitigating evidence or previous defense arguments." *Bryan*, *supra*, 101 Ohio St. 3d at 299.

But, like the Ohio Supreme Court, I am mindful that even egregious misconduct, standing alone, does not justify vacating a death sentence. Rather, Bryan is entitled to a new sentencing hearing on this ground only if the prosecutor's wrongful arguments so infected the fairness of the penalty-phase proceedings as to make the ensuing death sentence a violation of due process.

Given the substantial aggravating circumstances I cannot draw that conclusion – let alone find the Ohio Supreme Court's decision was unreasonable.

The aggravating evidence shows Bryan, merely to avoid arrest, murdered a police officer engaged in his lawful duties. He compounded the gravity of the situation by engaging in a gunfight on the streets of Cleveland with, and attempting to kill, Kenneth Niedhammer while fleeing from the scene.

83

In these circumstances, the Ohio Supreme Court reasonably concluded the prosecutor's deplorable conduct at the penalty phase was harmless "in view of the proven lack of significant mitigating evidence." *Bryan*, *supra*, 101 Ohio St. 3d at 299.

## H. Ineffective Assistance at the Guilt Phase

Bryan alleges his trial lawyers performed ineffectively at the guilt phase because they failed to: 1) request the appointment of a firearms expert; 2) prevent the prosecution from introducing evidence of Bryan's conviction for attempted robbery and his status as a parole violator; and 3) recover and view the dashboard videotape from Officer Leon's patrol car.

### 1. Default

The Warden contends Bryan has defaulted the second and third components of this claim because he did not raise them in state court. Bryan counters he preserved the claims by raising them in his application to reopen his direct appeal.

In his application to reopen, Bryan argued appellate counsel was ineffective for not raising a claim that trial counsel were ineffective *vis-a-vis* the "bad acts" evidence and the dashboard camera.

But that was insufficient to preserve the trial-counsel claim itself for habeas review, because an application to reopen preserves only claims that appellate counsel was ineffective. It "does not preserve the underlying claim [that appellate counsel was ineffective for omitting] because the two claims are analytically distinct." *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008).

To the extent Bryan argues he could not have properly raised, on direct appeal, a claim that counsel were ineffective *vis-a-vis* the videotape (because the claim depended on evidence outside

the record on direct appeal), that provides no basis for avoiding a default. This is so because Bryan nevertheless failed to raise this ineffective-assistance claim in his postconviction petition.

Because Bryan presents no other argument for excusing these defaults, I hold that he defaulted the second and third components of his ineffective-assistance-of-trial-counsel claim.

For the sake of completeness, I will also address these contentions on the merits.

### 2. Merits

To prevail on his ineffective-assistance claim, Bryan must "show both that his counsel provided deficient assistance and that there was prejudice as a result." *Harrington*, *supra*, 131 S. Ct. at 787.

The performance prong calls for "an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* My review of counsel's performance is highly deferential, and I am "required not simply to give [counsel] the benefit of the doubt, but to affirmatively entertain the range of possible reasons counsel may have had for proceeding as [they] did." *Pinholster*, *supra*, 131 S. Ct. at 1407.

"With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Harrington*, *supra*, 131 S. Ct. at 787.

"This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case." *Id.* at 792.

"Surmounting *Strickland*'s bar is never an easy task," but "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* at 788.

### (a). Firearms Expert

Detective Thomas Lucey, of the Cleveland Police Department, testified at trial about the amount of pressure – known as the "trigger pull" – one would have to exert to fire the Glock .45 caliber pistol that killed Officer Leon:

> Q:   Okay. Now, approximately how many pounds of pressure must be applied to the trigger in order for you to get the gun to fire?
>
> A:   At least ten and a half on this.
>
> Q:   Ten and a half pounds on the Glock?
>
> A:   I believe that's the manufacturer's standard.

(Doc. 57 at 149).

Detective Lucey did not suggest whether this was a significant amount of pressure. But presumably the prosecution introduced this testimony to rebut Bryan's claim that he fired the gun only "reflexively," and without the intent to kill Officer Leon.

During postconviction review, however, Bryan introduced evidence refuting Lucey's testimony. Contrary to the detective's belief, the trigger pull for the Glock .45 was only five-and-a-half pounds.

The Ohio Court of Appeals rejected Bryan's claim his trial lawyers were ineffective for failing to uncover and introduce this evidence at trial:

> Bryan argues that counsel was ineffective for failing to secure a firearms expert that would have testified that the gun used in the shooting had a light trigger pull. To support his claim, Bryan attached to his postconviction petition an online printout from www.glock.com that listed the specifications of the Glock 21 handgun and an affidavit from Kenneth Eyster, a gun shop owner. Bryan claims that an expert could have testified that the trigger pull on the gun he used was only 5.5 pounds, which would have supported the defense theory that Bryan accidentally pulled the trigger when he shot Officer Leon. The expert's testimony, Bryan further argues,

86

would have contradicted Detective Lacey's testimony that the gun had a 10-pound trigger pull.

Bryan's testimony belies what he is now trying to claim. During cross-examination, Bryan admitted that he had pulled the trigger as just "a reflexive motion to [Leon's] jump," as opposed to accidentally pulling the trigger. Therefore, the trial court did not abuse its discretion in denying this ground for relief.

*Bryan II*, *supra*, 2010-Ohio-2088, at ¶¶17-18.

As Bryan observes, the court of appeals apparently misunderstood the nature of Bryan's claim. Bryan never contended at trial he shot – and in fact disavowed shooting – Leon accidentally. Likewise, in his postconviction petition, Bryan did not contend the expert's testimony "would have supported the defense theory that Bryan accidentally pulled the trigger when he shot Officer Leon." *Bryan II*, *supra*, 2010-Ohio-2088, at ¶17.

There was therefore no basis to reject the claim on the ground Bryan was, in essence, trying to contradict his testimony at trial.

Nevertheless, while the state court's reasoning was flawed, its bottom-line judgment was not unreasonable. *Cf. Lopez v. Thurmer*, 573 F.3d 484, 495-96 (7th Cir. 2009) (denying habeas relief where state's court's "methodology" was unreasonable but its "result" did not involve unreasonable application of Supreme Court precedent).

As discussed above, the evidence of Bryan's guilt was overwhelming.

Although a firearms expert could have provided some evidence consistent with Bryan's claim that he acted reflexively (and the gun went off due to light trigger pull), that evidence was not so powerful as to create a reasonable probability of a different result.

Most importantly, it does not tend to negate any of the most powerful evidence supporting the jury's finding Bryan acted intentionally: Bryan's knowledge of the pending warrants, his

87

unwillingness to submit to the authorities unless it was on his own terms, and his awareness that Officer Leon would have, had he made the call on his police radio, in all probability discover Bryan was a wanted parole violator.

The state court's decision that Bryan could not prevail on this component of his *Strickland* claim was therefore reasonable.

### (b). Failure to Exclude "Bad Acts" Evidence

The record refutes Bryan's claim that counsel "failed" to prevent the prosecution from introducing evidence of his prior conviction and parole violations.

Bryan's attorneys litigated this issue vigorously before trial. They filed several motions seeking to exclude evidence of Bryan's criminal history: one styled "Motion to Exclude References to Accused's Criminal Record," and another titled "Objection to State's Notice of Intent to Use Evidence of Other Acts." (Doc. 29 at 147-48; Doc. 30 at 221-23).

The trial court, however, declined to rule on those motions before trial. Instead, the court urged the parties to "work on a solution." (Doc. 52 at 99-100).

Thereafter, defense counsel and the prosecution stipulated Bryan had been "convicted of attempted robbery . . . and was sentenced to a term of incarceration of two to ten years in prison," and that Bryan "was indicted . . . for theft and receiving stolen property, and that a warrant for his arrest was issued December 1st, 1999." (Doc. 57 at 2805).

More to the point, this evidence was relevant to Bryan's motive for killing Officer Leon, and also to prove his eligibility for the death penalty on the ground he killed Leon to escape detection for another offense.

88

So stipulating was an appropriate course of action, as the trial court was unwilling to exclude the evidence, the evidence was plainly admissible, and the defense opted to limit the scope of the evidence that came in – and thus the damage it might cause Bryan.

### (c). Dashboard Videotape

Detective Michael O'Malley testified that, although there was a video camera in Leon's patrol car, "the camera was inoperative and, in fact . . . there was nothing on the videotape concerning anything." O'Malley further explained that, had the camera been functioning, it may have captured the shooting. But O'Malley viewed the tape and determined there was "really nothing on this tape." (Doc. 57 at 368-71).

Bryan contends trial counsel were ineffective for failing to obtain a copy of the videotape while preparing the defense case.

This claim is meritless for at least two reasons.

First, Bryan has no evidence that counsel, in fact, failed to seek out or examine the videotape during discovery. On the contrary, the record shows defense counsel actively pursued pretrial discovery. (Doc. 29 at 37-38) (initial discovery motion seeking, *inter alia*, "[a]ny . . . recording . . . or copies thereof, available to or within the possession, custody, or control of the State"). In particular, they sought to examine all materials the authorities generated while investigating Officer Leon's death. (*Id.* at 67-68, 81-82)

I therefore conclude Bryan has not rebutted the strong presumption that counsel performed competently in seeking and handling discovery matters.

Second, there is no evidence that the videotape is anything other than what Detective O'Malley claimed it was: blank. Thus, even assuming that counsel erred in failing to recover the

tape, there is no basis to conclude playing the tape would have created a reasonable probability of a different result.

Finally, even if there were a recording of the encounter leading to Officer Leon's death, there is no reason whatsoever to believe that it would depict the stop and shooting in any way other than how Bryan described it. Accordingly, Bryan cannot show any error on counsel's part was prejudicial.

## I. Ineffective Assistance at the Penalty Phase

Bryan also alleges that counsel performed ineffectively at the penalty phase.

He argues that his attorneys failed to: 1) present "any substantive mitigating evidence"; 2) prepare Bryan's mother to testify effectively; 3) obtain and present Bryan's prison records; 4) secure the services of a neuropsychologist; 5) retain a cultural mitigation specialist; and 6) introduce testimony from a substance-abuse expert. (Doc. 18 at 83-95).

## 1. Background

After the jury handed down its verdicts at the guilt phase on November 7, the court had a brief exchange with the parties about the penalty phase. The court ordered, *inter alia*, the defense to produce to the prosecution any expert reports prepared by their mitigation witnesses. The exchange suggests the defense was considering calling at least one expert at the penalty phase.

But when the penalty phase began two days later, defense counsel represented they intended to present no expert testimony, and only a short mitigation case:

> The Court: We have had some conversation as to what the defendant intends to offer. The Court has been informed that the mitigation at this point to be presented by the defense will be what I consider to be extremely brief, perhaps only 15 minutes, and that would be the testimony of the mother of the defendant and the unsworn statement of the defendant himself.

90

The Court is somewhat surprised to hear that the mitigation is that brief, but understands that – that the brevity of the mitigation at this point may be a legal decision made by the defense.

Does the prosecution or the defense wish to be heard?

Steve Dever.

Mr. Dever:      Yes, your Honor. I would just like the record to reflect that there has been a mitigation specialist, Mrs. Joan Synenberg, who has sat through the entire trial proceedings and apparently is also working with a mental health professional, a Dr. – what's his name?

Mr. Saffold:    Kaleta.

Mr. Dever:      – who is a psychologist, who has also been present for portions of the trial.

If there's a decision not to present a mitigation specialist or not to have a psychiatrist or psychologist testify or that the defense has chosen not to request a pre-sentence report by the County Probation Department for purposes of the penalty phase or a referral to the Court's Psychiatric Clinic for an evaluation of this defendant, these were all strategy decisions, as opposed to someone's claim later on in evaluating this record that it was in fact ineffective assistance of counsel.

I just want the record to reflect that there have been a number of discussions about the defense strategy or choice not to go forward with this type of evidence.

Is that clear enough?

The Court:      Does the defense wish to be heard?

Mr. Saffold:    Your Honor, to the extent we are going to be heard on the record relative to issues of strategy, we would ask that that be done in the absence of the prosecutor.

Mr. Dever:      Fair enough. We will for this issue leave the room.

*     *     *

91

Mr. Saffold:    Yes, your Honor.

Mr. McDonnell and I have worked zealously towards preparation for a prospective mitigation phase.

In working zealously towards that end, we have been given the opportunity to conference with a mitigation specialist on regular basis, and that person is Joan Synenberg.

Ms. Synenberg has compiled voluminous records relative to mitigation, close to half a dozen large-size, three-ring binders full of mitigation materials.

We have gone through all of those materials, both Mr. McDonnell and myself, individually and together.

We have discussed what is in those materials thoroughly and have decided to use a sum total of perhaps three pages of those materials in mitigation because we feel that the remaining portions of those materials would not be beneficial to our client in the mitigation phase.

Additionally, your Honor, we have been given the opportunity by the Court to secure a psychologist, a non-court-employed psychologist, a private psychologist, who has spent, I would say, somewhere between 15 and 30 hours with our client, again both with our client individually, the two of them, and then also with our client in our presence and in Ms. Synenberg's presence.

Having done all of that, our psychologist has shared with us a great deal of information that we would not have been able to glean without his assistance, without his expertise.

Having taken all of that evidence in, we have decided strategically not to have him testify on our client's behalf.

All of these decisions are things we have discussed with our client.

Together we have decided that the psychologist, although tremendously helpful, would not be beneficial testifying before the jury.

There were also numerous witnesses given to the State in name on our witness list, many of whom, if not the great majority of whom,

would have served as mitigation witnesses, your Honor, if we had decided to do so.

In not doing so, we believe very thoughtfully we have made the decision not to call many of those witnesses because we thought it was in our client's best interest relative to the mitigation phase.

The Court:    All right. Thank you very much.

(Doc. 58 at 226-31).

Thereafter, the prosecution introduced all evidence that the parties had introduced at the guilt phase. (*Id.* at 253-54).

The defense called Bryan's mother Cassandra. She  testified that "she 'would feel very devastated if Bryan were executed,'" and that "'executing him *** is just going to widen the circle of grief and violence *** and the suffering that everyone is going through.'" *Bryan*, *supra*, 101 Ohio St. 3d at 301. Bryan also took the stand to read an unsworn statement in which he expressed remorse, and took responsibility, for Leon's death.

## 2. State Courts' Decisions

The Ohio courts adjudicated this claim twice. First, on direct appeal, the Ohio Supreme Court rejected the claim based on counsel's failure to present "'viable' mitigating evidence":

The presentation of mitigating evidence is a matter of trial strategy. *State v. Keith*, (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47. Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Wiggins v. Smith*, (2003), 539 U.S. 510, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471, quoting *Strickland v. Washington*, 466 U.S. at 690–691, 104 S.Ct. 2052, 80 L.Ed.2d 674.

Here, the defense employed a mitigation specialist, a psychologist, and an investigator. Prior to the penalty-phase proceedings, the defense counsel informed the trial court that the mitigation specialist prepared "voluminous records relative to mitigation" and that the defense psychologist spent 15 to 30 hours interviewing Bryan. The defense counsel carefully reviewed this information, and after discussing

the matter with Bryan, decided that "it was in our client's best interest" not to introduce this evidence. The defense counsel made a strategic trial decision, which cannot be the basis for an ineffective assistance claim. See *State v. Mason*, 82 Ohio St.3d at 169, 694 N.E.2d 932.

Finally, resolving this issue in Bryan's favor would require speculation. Nothing in the record before us indicates what testimony the defense experts would have presented as no proffer has been made.

Bryan also claims that his defense counsel were deficient in calling his mother, Cassandra Bryan, as a witness[.]

* * *

Bryan argues that calling Cassandra as a mitigation witness resulted in damaging cross-examination of her. Bryan points to cross-examination eliciting that Cassandra taught him right from wrong, taught him the value of life, taught him to respect the police, and taught him about hard work and respect for authority. Bryan also points to cross-examination eliciting that Bryan's father was involved in his life and that Bryan's actions on June 25 were contrary to his upbringing.

The defense made a legitimate tactical decision to call Cassandra as a witness. His mother's testimony helped to humanize Bryan before the jury. Moreover, Bryan's argument that Cassandra's testimony was detrimental is doubtful. Indeed, testimony that Bryan was brought up in a good home with strong values can be viewed in a favorable light. Such testimony might tend to show that Bryan's crimes were an aberration and that he has rehabilitation potential.

We also reject Bryan's other complaints about his mother's cross-examination. For example, Cassandra testified that she saw Bryan two months prior to the murders; however, she was unaware that he was a fugitive from justice and that he was carrying a gun. It is hard to imagine how such testimony was prejudicial, since earlier testimony established that Bryan carried a gun and was a parole violator.

*Bryan*, *supra*, 101 Ohio St. 3d at 300-01.

Bryan renewed his ineffective-assistance claim on postconviction review, this time armed with the mitigating evidence his trial attorneys had generated but declined to present at the penalty phase. After the postconviction trial court reviewed this evidence, it held Bryan could not prove

94

counsel performed deficiently, or that there was a reasonable probability of a different result. (Doc. 35 at 132-44; Doc. 36 at 54-57). The Ohio Court of Appeals affirmed:

### Expert Witnesses

In his second, sixth, eighth, ninth, and tenth grounds for relief, Bryan argues that defense counsel failed to obtain and utilize proper experts to assist in the sentencing phase; specifically, a competent psychologist, a cultural expert, and a substance abuse expert. These omissions, Bryan argues, meant that defense counsel was unable to present relevant mitigating evidence. To support his claims, Bryan presented various affidavits stating that neurological testing should have been performed as it could have provided additional mitigation evidence to present to the jury. The trial court noted that counsel did secure the assistance of two investigators, a mitigation specialist, and a psychiatrist to assist in the preparation of trial and sentencing phases, and Bryan failed to show how the appointment of additional experts would have assisted in his defense.

As the Ohio Supreme Court already noted: "Bryan argues ineffective assistance of counsel during the penalty phase because counsel failed to present 'viable' mitigating evidence. * * * Prior to the penalty-phase proceedings, the defense counsel informed the trial court that the mitigation specialist prepared 'voluminous records relative to mitigation' and that the defense psychologist spent 15 to 30 hours interviewing Bryan. The defense counsel carefully reviewed this information, and after discussing the matter with Bryan, decided that 'it was in our client's best interest' not to introduce this evidence. The defense counsel made a strategic trial decision, which cannot be the basis for an ineffective assistance claim. See *State v. Mason*, 82 Ohio St.3d at 169, 1990-Ohio-370, 694 N.E.2d 932." *Bryan* at ¶ 72.

"Finally, resolving this issue in Bryan's favor would require speculation. Nothing in the record before us indicates what testimony the defense experts would have presented as no proffer has been made." *Id.* at ¶ 191, 804 N.E.2d 433.

Therefore, the court's dismissal of the petition on these grounds was not an abuse of discretion.

### Mitigation Investigation

In his third, seventh, twelfth, and thirteenth grounds for relief, Bryan argues that defense counsel was ineffective for failing to adequately interview witnesses and failing to obtain available records that would have assisted in the mitigation phase of sentencing.

First, Bryan argues that he was involved in two car accidents that required neuropsychological evaluation and he grew up in a household filled with physical and emotional abuse. He supported these claims with affidavits from himself and his mother. Although a trial court should give affidavits filed in support of a postconviction petition "due deference," it may also "judge their credibility in determining whether to accept the affidavits as true statements of fact." *Calhoun* at 284, 714 N.E.2d 905. In assessing the credibility of affidavit testimony, consideration should be given to all relevant factors. *Id.* Among those factors are: (1) whether the judge reviewing the petition also presided at the trial; (2) whether multiple affidavits contain nearly identical language or otherwise appear to have been drafted by the same person; (3) whether the affidavits contain or rely on hearsay; (4) whether the affiants are relatives of the petitioner or otherwise interested in the success of the petitioner's efforts; and (5) whether the affidavits contradict evidence proffered by the defense at trial. *Id.* at 285, 714 N.E.2d 905.

Further, a trial court may find an affidavit to be contradicted by testimony in the record given by the same witnesses or to be internally inconsistent, thereby weakening the credibility of that testimony. *Id.* Depending on the record, one or more of these or other factors may be sufficient to justify the conclusion that an affidavit asserting information outside the record lacks credibility. *Id.*

Here, the same judge who presided over the trial reviewed the postconviction petition. The record demonstrates that the trial court gave careful consideration to the arguments set forth in the petition, as demonstrated by in-depth findings of fact and conclusions of law. Further, the affiants were interested persons and an "affidavit from the petitioner is considered self-serving and therefore it is reasonable to afford it less credibility." *State v. Haschenburger*, Mahoning App. No. 08-MA-223, 2009-Ohio-6527, ¶ 46.

Bryan also argues that his attorney should have presented evidence that he was exposed to Black Panther philosophy, did not meet his father until he was 14 years old, and was exploring the Muslim faith. We do not find that the trial court abused its discretion in finding that this evidence was not of sufficient quality to undermine Bryan's guilt or make his mitigation hearing unreliable.

Next, Bryan claims that his attorney failed to discuss his good prison record or call witnesses that would have testified that he was well-liked when he was in Community Re-Entry. Again, the evidence supporting these claims does not rise to the level of finding that his mitigation hearing was unreliable. The record shows that defense counsel interviewed the Community Re-Entry witnesses and chose not to have them testify. And, as the state points out, calling these witnesses to the stand would have permitted the state to introduce more evidence concerning Bryan's inability to integrate into society and be rehabilitated. Moreover, the Ohio Supreme

Court has already ruled that trial counsel's selection of mitigation witnesses was within acceptable trial tactics. See *supra*.

Bryan further argues that the information regarding his substance abuse problems. Even though Bryan testified that he had abused drugs in the past and was under the influence the morning of the shootings, he also testified that he did not have a substance abuse problem. Thus, counsel would have been hard-pressed to develop mitigation testimony to the contrary, and we will not fault counsel for failing to do so.

Therefore, we do not find that the trial court abused its discretion in determining that Bryan's proposed grounds for relief did not warrant an evidentiary hearing.

Mother's Testimony

In his fourth ground for relief, Bryan claims that counsel failed to adequately prepare his mother, Cassandra Bryan, for her testimony during the sentencing phase of the proceedings and that his mother should have been more prepared to testify regarding his social history and background. To support his claim, Bryan attaches an affidavit from social worker and mitigation specialist Dorian Hall and an affidavit from Cassandra Bryan. In his affidavit, Hall opined that defense counsel should have further developed Cassandra Bryan's testimony. The trial court found that Bryan failed to specifically articulate how additional preparation of his mother would have changed the outcome of the proceedings. We agree.

We note that on direct appeal, Bryan argued that his counsel called Cassandra as a mitigation witness and that questioning her resulted in a damaging cross-examination of her. The Ohio Supreme Court found that "[t]he defense made a legitimate tactical decision to call Cassandra as a witness. His mother's testimony helped to humanize Bryan before the jury. Moreover, Bryan's argument that Cassandra's testimony was detrimental is doubtful. Indeed, testimony that Bryan was brought up in a good home with strong values can be viewed in a favorable light. Such testimony might tend to show that Bryan's crimes were an aberration and that he has rehabilitation potential." *Bryan* at ¶ 194.

We agree with the trial court that Bryan has failed to demonstrate how his defense was prejudiced as contemplated by *Strickland*, even with the additional information presented by Bryan in support of this ground for relief. Moreover, we are bound by the factual findings of the Ohio Supreme Court in *Bryan*. Therefore, we find that the trial court did not abuse its discretion in dismissing the petition based on this ground for relief.

Ability to Adjust to Prison Life

In his fifth ground for relief, Bryan argues that defense counsel failed to present evidence concerning his ability to adjust to life in prison. The trial court found that given the facts and circumstances of the case, it was not likely that a jury would give much weight to Bryan's prison record and even if counsel had presented such evidence, Bryan was still found guilty of three aggravating circumstances: killing a police officer engaged in his duties, murder to escape accounting for another crime, and murder as part of a course of conduct involving the attempt to kill two or more persons. See R.C. 2929.04(A)(3), (5), and (6); see, also, *State v. Simko* (1994), 71 Ohio St.3d 483, 644 N.E.2d 345. There was also evidence that Bryan did not adjust well to prison life as he would continually break confinement and committed criminal acts while in prison.

Therefore, we find no abuse of discretion in the trial court's rejection of Bryan's ineffective assistance of counsel.

We further note that Bryan's claims may be barred by res judicata. As stated *supra*, a petition for postconviction relief is not the proper vehicle to raise issues that were or could have been determined on direct appeal. In his postconviction petition, the information that Bryan alleges in support of his claims was available to him at the time of trial, is merely cumulative, and could have been raised on direct appeal.

After reviewing the trial court's decision, we cannot conclude that the trial court abused its discretion when it dismissed the petition without a hearing on Bryan's proposed grounds for relief.

*Bryan II*, *supra*, 2010-Ohio-2088, at ¶¶23-42.

### 3. Analysis

"Defense attorneys in capital cases have a responsibility to investigate their client's background and to consider mitigating evidence." *Scott v. Houk*, 760 F.3d 497, 508 (6th Cir. 2014). "The scope of the investigation required will vary from case to case[.]" *Id.*

"In assessing whether a defendant's counsel was ineffective at a mitigation hearing for failing to introduce certain evidence, the focus must be on whether the investigation supporting counsel's

98

decision not to introduce mitigating evidence of the defendant's background was itself reasonable." *Loza v. Mitchell*, 766 F.3d 466, 488 (6th Cir. 2014).

To measure the reasonableness of counsel's investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

"When a defendant challenges a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland v. Washington*, 466 U.S. 668, 695 (1984).

### (a). Failure to Introduce "Substantive Mitigation Evidence"

Bryan faults counsel for introducing no "substantive mitigating evidence." (Doc. 18 at 108).

To resolve this claim, I must consider the reasonableness of counsels' investigation supporting the decision to present only a limited mitigation case. *Loza*, *supra*, 766 F.3d at 488.

There is no question counsel conducted a constitutionally adequate investigation.

The record establishes counsel had the assistance of a mitigation specialist, a psychologist, and an investigator. Together the defense team generated "close to half a dozen three-ring binders full [of] mitigating materials." (Doc. 58 at 229).

Bryan concedes, moreover, the investigation uncovered evidence regarding his: 1) troubled childhood; 2) his involvement in car accidents that left him, for a period of time, unconscious and led to a neurological evaluation; 3) interest in the Muslim faith; 4) record of adjusting well to prison; 5) successful work experience in a Community Re-entry Program; and 6) dependence on, or at least heavy use of, drugs and alcohol. (Doc. 18 at 110-11).

99

Bryan's claim is therefore a direct attack on the strategic decision counsel made after generating this evidence and estimating its likely impact on the jury. He contends that, "[w]ithout giving the jury some means by which to understand [Bryan's] life and how it evolved into the shooting of a police officer, the jury was left with nothing else but to define him by that one act." (*Id.*). Consequently, Bryan argues, counsel had no choice but to present the mitigating evidence detailed above.

Because the state courts adjudicated this claim on the merits, Bryan is not entitled relief if there is "any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Pinholster*, *supra*, 131 S. Ct. at 1426.

A review of the record establishes that defense counsels' strategy throughout the trial was to show Bryan had taken responsibility for killing Officer Leon. This is clear, first, from the defense's reliance on an involuntary-manslaughter theory, which permitted Bryan to admit firing the fatal shot while also contending he lacked the mental state needed for a conviction on the aggravated-murder counts.

Likewise, at the penalty phase, Bryan took the stand to read a statement expressing his remorse for the officer's death, acknowledging his responsibility for Leon's death, and lamenting the consequences of actions, both for Officer Leon's survivors and his own family.

Thereafter, defense counsel devoted his summation to highlighting other evidence that would have supported a sentence other than death: 1) Bryan's continual expression of sorrow and remorse for Officer Leon's death, beginning shortly after his arrest and continuing through his trial testimony (Doc. 58 at 293, 295); 2) the absence of any prior calculation and design on Bryan's part (*id.* at 293); 3) the value of Bryan's life (*id.* at 296); 4) Bryan's involvement in the lives of his stepchildren (*id.*);

100

5) the fact that, if the jury spared his life, Bryan would spend the rest of his life in prison (*id.*); and

6) Bryan's interest in mentoring his fellow prisoners (*id.*).

Counsel also reminded the jury that a single juror's vote could prevent the court from imposing a death sentence. (*Id.* at 287, 290).

In these circumstances, emphasizing Bryan had accepted responsibility and expressed remorse for the death of Officer Leon was an objectively reasonable strategy. *E.g.*, *Roe v. Flores-Ortega*, 528 U.S. 470, 481 ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."). The strategy had support in the evidence, and was – even with the benefit of hindsight – no less likely to result in a sentence less than death than a strategy grounded the withheld mitigation evidence.

Having elected to pursue that strategy, a reasonable attorney could conclude the mitigating evidence Bryan's lawyers did not present – in particular the evidence relating to Bryan's childhood and upbringing, alleged drug and alcohol dependency, and potential brain damage – undermined, or at the very least was in obvious tension with, Bryan's attempt to take responsibility for the crime.

That is, defense counsel could plausibly imagine the jury being skeptical of Bryan attempting to claim, on the one hand, he had accepted responsibility for Leon's death and, on the other, he murdered Leon essentially because of the unfortunate circumstances of his childhood, his drug and alcohol habit (a habit that, at trial, Bryan denied having), and brain damage (which no evidence in the record suggests Bryan actually has).

For that reason, counsel could reasonably conclude – as he explained to the trial court before the penalty phase began – the mitigation evidence he generated "would not be beneficial" to Bryan. (Doc. 58 at 231). While not necessarily harmful in the abstract, the proposed mitigation evidence

101

risked undermining the plausibility of Bryan's claim to have accepted the consequences of his actions.

Equally important, moreover, to defense counsel's calculus was the fact that the mitigating evidence at issue, though it suggested Bryan lived a life few would desire for themselves, was not so grave, harrowing, or substantial that any reasonable attorney would have be duty-bound to present it. *E.g.*, *Wiggins*, *supra*, 539 U.S. at 525, 535 (evidence of petitioner's "excruciating life history" included "suffer[ing] physical torment, sexual molestation, and repeated rape" during childhood); *Moore*, *supra*, 708 F.3d at 789 ("The mitigation evidence in favor of Moore was not strong . . . there were no accounts of parental abuse or neglect, no history of witnessing violence, no indication of low intelligence"); *Strouth v. Colson*, 680 F.3d 596, 604 (6th Cir. 2012) ("Strouth's upbringing, forlorn though it was in several respects, does not reflect the kind of extreme abuse and deprivation found in other cases").

In light of all this, the question is whether Bryan has proved any fairminded judge reviewing his *Strickland* claim would conclude the only reasonable way to defend Bryan without violating the Constitution was to introduce the mitigation evidence Bryan's lawyers forwent. *Cf. Dixon*, *supra*, 132 S. Ct. at 27; *Pinholster*, *supra*, 131 S. Ct. at 1426.

Bryan has not carried that burden.

As the Supreme Court has said time and again, there are "countless ways to provide effective assistance in any given case." *Harrington*, *supra*, 131 S. Ct. at 788; *see also Strickland*, *supra*, 466 U.S. at 689.

This case proves that observation, as a reasonable defense lawyer could have decided – contrary to the path Bryan's attorney chose – to de-emphasize the responsibility defense and rely on

102

the mitigating evidence that was not presented. Yet that path was not without its bumps, either: the mitigating evidence was hardly compelling – especially when balanced against the weighty evidence in aggravation – and its introduction was sure to prompt rhetorical questions from the prosecution about the countless individuals who, despite the hardships of their upbringing, did not become, like Bryan, a cop killer.

But a competent defense lawyer could, for the reasons already discussed, also have chosen the path that Bryan's lawyers took. For all these reasons, Bryan has not shown the Ohio courts were unreasonable in concluding his lawyers performed competently.

### (b). Failure to Prepare Cassandra Bryan

Bryan next contends his attorneys were ineffective for failing to prepare his mother, Cassandra Bryan, to testify effectively at the penalty phase. He argues counsel met with Cassandra only once before she testified, and likely for that reason Cassandra was ill-prepared to handle the prosecutor's cross-examination.

Bryan also alleges the defense should have objected to Cassandra's testimony on cross-examination as misleading because it wrongly suggested Bryan had a positive childhood.

This claim lacks merit.

As the Ohio Supreme Court explained on direct appeal, "the defense made a legitimate tactical decision to call Cassandra," whose testimony "helped to humanize Bryan before the jury." *Bryan*, *supra*, 101 Ohio St. 3d at 301. This was a plausible course of action, as it complemented the responsibility defense, and Cassandra's testimony brought home the gravity of the jury's decision to impose a death sentence.

Contrary to Bryan's argument, Cassandra's testimony on cross-examination was not prejudicial, as *Strickland* defines that term. Indeed, it too comported with the defense strategy. As the Ohio Supreme Court observed, "testimony that Bryan was brought up in a good home with strong values can be viewed in a favorable light" because it could "show that Bryan's crimes were an aberration and that he has rehabilitation potential." *Id.*

For these reasons, Bryan has not shown the state court's rejection of this part of his ineffective-assistance claim was unreasonable.

### (c). Failure to Introduce Prison Records

Bryan also contends counsel should have introduced evidence of his ability to adjust well to life in prison.

The Ohio Court of Appeals rejected that claim because Bryan could not show prejudice. It found not only that the aggravating evidence was overwhelming, but also that the record contained evidence "that Bryan did not adjust well to prison life as he would continually break confinement and committed criminal acts while in prison." *Bryan II*, 2010-Ohio-2088, at ¶39.

Even accepting Bryan's claim some evidence showed he could adjust well to life in prison, there was also evidence suggesting he could not. Trial counsel was thus not deficient for declining to introduce this evidence, and, given the overwhelming evidence adduced against Bryan at the penalty phase, the state court reasonably concluded Bryan could not show prejudice.

### (d). Failure to Retain a Neuropsychologist

Bryan further contends that, because defense counsel were aware of his involvement in two car accidents when he was a child, they should have retained a neuropsychologist to help establish whether Bryan had any "neurological damage." (Doc. 18 at 117).

104

Like testimony about Bryan's drug alcohol abuse and difficult childhood, the proposed evidence would have been inconsistent with Bryan's mitigation phase theme of acceptance of responsibility and remorse. But, even assuming defense counsel was deficient for not retaining a neuropsychologist, and assuming further (without any evidence in the present record), that such an expert would have produced evidence of brain damage, Bryan cannot establish the state court's rejection of this claim on prejudice grounds was unreasonable.

### (e). Failure to Retain a Cultural Mitigation Expert and a Substance Abuse Expert

Finally, Bryan faults counsel for not retaining two additional experts: 1) a cultural mitigation expert, who could have explained to the jury Bryan's struggles growing up an African-American; and 2) a substance abuse expert who would have opined on the difficulties Bryan's dependency on drugs and alcohol caused.

I reject this claim on the same basis I rejected Bryan's claim regarding the failure to introduce "any substantive mitigation evidence": the evidence arguably detracts from the defense effort to have Bryan accept responsibility for his actions and express remorse for Officer Leon's death, and thus a reasonable defense lawyer could properly decline to seek it out or introduce it.

Like the other mitigation evidence counsel chose not to present, this evidence could have suggested to the jury that, contrary to Bryan's unsworn statement and the arguments of defense counsel, Bryan had not accepted responsibility for his conduct, but rather blamed his actions on a substance-abuse problem – which, notably, Bryan denied he had – and on his upbringing.

Furthermore, Bryan has not shown this evidence would have created a reasonable probability the result of the penalty phase would have been different.

105

\*    \*    \*

For these reasons, I reject Bryan's claim that trial counsel performed ineffectively at the penalty phase.

### J. Ineffective Assistance of Appellate Counsel

In his tenth claim for relief, Bryan argues that his appellate lawyer was ineffective for not arguing the prosecution failed to prove beyond a reasonable doubt one of the capital specifications alleged in the indictment.

The specification at issue is O.R.C. § 2929.04(A)(3), which, as charged in Bryan's case, alleged Bryan had killed Officer Leon "for the purpose of escaping detection, apprehension, trial, and/or punishment for another offense committed by him, to-wit: Attempted Robbery and/or Receiving Stolen Property and/or Theft."

Bryan contends that, at most, the prosecution proved he committed the murder to escape detection for a parole violation. But because a parole violation is not an "offense" under Ohio law, Bryan argues, the evidence was insufficient to prove the (A)(3) specification. He further asserts the jury's consideration of that invalid aggravating factor skewed the jury's weighing of the aggravating and mitigating evidence. *E.g.*, *Brown v. Sanders*, 546 U.S. 212 (2006).

Finally, Bryan contends that the (A)(3) specification was unconstitutionally vague as charged in his case.

### 1. Default

The Warden contends Bryan defaulted this claim by omitting it from his application to reopen his direct appeal.

A review of that pleading, however, refutes the Warden's argument: Bryan raised precisely these arguments in seeking to reopen his direct appeal on account of appellate counsel's ineffectiveness. (Doc. 31 at 452-53, 462-71).

I further note that, although the Ohio Supreme Court denied Bryan's application to reopen because it was untimely, the Warden failed to assert the claims contained in the application were defaulted on that basis. Nevertheless, Bryan concedes – and I accept his concession – that the Ohio Supreme Court's denial, on timeliness grounds, of his application to reopen caused a procedural default of his appellate-counsel claim. (Doc. 63 at 173).

Bryan argues I can excuse the default under *Martinez v. Ryan*, — U.S. —, 132 S. Ct. 1309 (2012), which holds that the "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's default of a claim of ineffective assistance at trial." *Id.* at 1315.

That argument lacks merit, as *Martinez* – which does not apply in Ohio in any event, *Williams v. Mitchell*, --- F.3d ----, 2015 WL 4079430, *7 (6th Cir.) – permits a court to excuse a default only of claim that trial counsel was ineffective. *Atkins v. Holloway*, --- F.3d ----, 2015 WL 4098358, *3-4 (6th Cir.); *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013).

Bryan also asserts that Ohio's application-to-reopen procedure does not afford the attorney preparing the application sufficient to time to review the record of a capital trial and draft a proper application. For that reason, Bryan continues, the Ohio Supreme Court's denial of his application to reopen is not an "adequate" bar to federal habeas review. *See generally Lee v. Kemna*, 534 U.S. 362, 375-78 (2002).

107

This argument is unavailing, as the Sixth Circuit has held repeatedly that an Ohio court's denial of an application to reopen on timeliness grounds is an independent and adequate ground of decision that blocks federal habeas review. *Parker v. Bagley*, 543 F.3d 859, 862 (6th Cir. 2008); *see also Baker v. Bradshaw*, 495 F. App'x 560, 565 (6th Cir. 2012).

For these reasons, I conclude Bryan's appellate-counsel claim is procedurally defaulted.

## 2. Merits

In any event, Bryan has not shown his appellate lawyer was ineffective for raising this sufficiency-of-the-evidence challenge.

As Bryan notes, to prove the (A)(3) specification, the prosecution had to establish Bryan killed Officer Leon to avoid apprehension, detection, or punishment for an "offense." That Bryan committed the murder to escape detection for an "offense" was thus an element of the capital-murder charge. *State v. Jones*, 91 Ohio St. 3d 335, 347 (2001); *cf. Ring v. Arizona*, 536 U.S. 584 (2002).

There is no dispute Bryan committed the "offense" of attempted robbery: Bryan so stipulated at trial. Nor is there any dispute that, after Bryan was paroled on the attempted-robbery conviction, he violated his parole term. Nor, finally, is there any dispute a reasonable jury could infer from Bryan's testimony that he killed Officer Leon to avoid being detected as a parole violator.

The question is whether a rational jury could conclude from this evidence that Bryan had killed Officer Leon to avoid detection, punishment, or apprehension for the attempted-robbery offense to which the parole term attached.

Under Ohio law, when a parolee violates the terms of his parole, authorities may arrest the parolee and return him to prison to serve the remainder of the sentence for the underlying offense. According to the Ohio Supreme Court:

> Parole is a form of supervised release, but it is not merely an addition to an individual's sentence. When a person is paroled, he or she is released from confinement before the end of his or her sentence and remains in the custody of the state until the sentence expires or the Adult Parole Authority grants final release. R.C. 2967.20(C); 2967.13(E); 2967.15(A); 2967.16(C)(1). If a paroled person violates the conditions associated with the parole, he or she may be required to serve the remainder of the original sentence[.] Ohio Adm. Code 5120:1-1-19(C).

*State v. Clark*, 119 Ohio St. 3d 239, 246 (2008); *see also In re Long*, 24 Ohio App. 3d 32, 36 (1985) ("a parolee, upon revocation of parole, is returned to serve the remainder of his original sentence, not a new sentence").

Of course, Bryan is correct that the prosecution argued Bryan's immediate motive in the killing was to escape detection, apprehension, or punishment for a parole violation, rather than for the underlying attempted-robbery conviction.

But this was merely a rhetorical tactic, not a failure in the proof.

The evidence was sufficient to permit a jury to find Bryan murdered Officer Leon to avoid apprehension, detection, or punishment for his parole violation.

In making that finding, the jury necessarily found that Bryan's sought to elude capture or punishment for the "offense" underlying the parole term – and to which it attached as a matter of Ohio law: attempted robbery. Bryan's own statements to his girlfriend sufficed to persuade the jury that he killed Officer Leon to avoid detection, arrest, parole revocation, and the ensuing punishment of being returned to prison on the attempted-robbery conviction.

Finally, there is no merit to Bryan's claim the (A)(3) specification was unconstitutionally vague.

He contends that, because the prosecution charged the specification in the disjunctive – using a series of "and/or's" in listing the offenses for which Bryan sought to avoid detection – the jury may not have been unanimous "as to the presence of the offense element." (Doc. 18 at 141).

Contrary to Bryan's contention, "it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission." *Schad v. Arizona*, 501 U.S. 624, 649 (1991) (Scalia, J., concurring in part and concurring in judgment); *see also id.* at 631-33 (plurality opinion).

Here, the (A)(3) specification charged Bryan with capital murder for killing Officer Leon to avoid detection, apprehension, or punishment for an offense. In resolving that charge, the jury had the option of finding which of three offenses, or which combination of them, motivated Bryan's conduct. Under *Schad*, there was no requirement the jury had to agree on the offense for which Bryan sought to avoid detection, apprehension, or punishment.[7]

For these reasons, Bryan is not entitled to relief on his claim that appellate counsel was ineffective.

### K. Failure to Merge Capital Specifications

For his eleventh ground for relief, Bryan argues the trial court should have merged two of the capital specifications alleged in the indictment: 1) that Bryan had killed or attempted to kill two or

---

[7] Bryan claims in a related vein there was insufficient evidence to prove he committed the offenses of receiving stolen property and theft. Even assuming that is so, there was sufficient evidence to prove he committed attempted robbery, and that his desire to avoid apprehension, detection, or punishment for that offense motivated the murder. Given the one-good-count rule, this claim would have been meritless on direct appeal. *Tabler v. State*, 34 Ohio St. 127 (1877); *accord Griffin v. U.S.*, 502 U.S. 46, 49-51(1991); *State v. Sims*, 2005-Ohio-1978, ¶30 (Ohio App.); *State v. Hurd*, 1999 WL 281305, *28-29 (Ohio App.).

more people in a single course of conduct, *see* O.R.C. § 2929.04(A)(5); and 2) that Bryan had killed a police officer in the course of the officer's lawful duties, *see* O.R.C. § 2929.04(A)(6).

According to Bryan, "[t]he killing of officer Leon is also an element to of [*sic*] the A(5) specification course of conduct specification [*sic*]. The judge [thus] charged the jury there existed three separate and distinct aggravating factors, where only two existed." (Doc. 18 at 142).

For that reason, Bryan contends, the jury's process of weighing the aggravating circumstances against the mitigating circumstances "was rendered invalid by the consideration of two improper aggravating factors." (*Id.*).

The Ohio Supreme Court rejected this claim on direct appeal, holding not only that Bryan forfeited the claim by failing to request a merger, but also that state law did not require merger in the first place:

> Bryan contends that the trial court erred in failing to merge the R.C. 2929.04(A)(5) (course of conduct) and R.C. 2929.04(A)(6) (killing a police officer) death penalty specifications. However, the defense failed to request merger and thus waived all but plain error. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 137. Moreover, merger is not required when the aggravating circumstances arise from a divisible course of conduct. *State v. Robb* (2000), 88 Ohio St.3d 59, 85, 723 N.E.2d 1019.

> The R.C. 2929.04(A)(5) and (A)(6) specifications are not duplicative, since they did not arise from the same act or indivisible course of conduct. The R.C. 2929.04(A)(6) specification arose from the murder of Officer Leon, whereas the R.C. 2929.04(A)(5) specification arose from the attempted murder of another person. Thus, no merger was required. Cf. *State v. Jones*, 91 Ohio St.3d at 349, 744 N.E.2d 1163 (R.C. 2929.04[A][3] and [A][6] specifications treated separately); *State v. Palmer* (1997) 80 Ohio St.3d 543, 574, 687 N.E.2d 685 (R.C. 2929.04[A][5] and [A][7] specifications treated separately).

*Bryan*, *supra*, 101 Ohio St. 3d at 302.

111

Although the Ohio Supreme Court held that Bryan forfeited this claim, the Warden failed to assert a procedural default in this proceeding.

Regardless, Bryan's claim is meritless under any standard of review because the Ohio Supreme Court determined – as a matter of Ohio law – that the capital specifications at issue "did not arise from the same act or [an] indivisible course of conduct," and thus that Bryan was not entitled to a merger. *Id.*

That interpretation of state law is binding on me, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991), and I have no authority to second-guess it. Because Bryan's claim depends on a non-reviewable interpretation of Ohio law, he is not entitled to habeas relief on this ground.

In any event, I fully concur in the Ohio Supreme Court's ruling the two specifications are divisible. The specifications depended on different evidence and focused on the unique harms Bryan's conduct caused: one focused on Bryan's killing of a police officer, while the other focused on the danger Bryan posed when, after he had killed Officer Leon, he tried to murder another person.

Accordingly, the prosecution needed different evidence to prove each specification, and in proving one specification, the prosecution did not necessarily prove the other. There was therefore no bar, under Ohio law or otherwise, to the jury's consideration of these two specifications.

Finally, even assuming the Ohio Supreme Court's application of Ohio law were insufficient to resolve this claim, Bryan has identified no Supreme Court authority for the proposition that improper weighing occurs when a jury weighs two aggravating factors that overlap only in part. *Cf. Scott*, *supra*, 760 F.3d at 506 ("Scott's argument cannot succeed because he does not cite any precedent from the United States Supreme Court indicating that two or more aggravating factors must be merged when they are based on the same underlying conduct.").

112

**L. Violation of Bryan's Right to Be Present**

Bryan next alleges the trial court violated his right to be present during a "critical stage" of the proceedings when the court answered, outside his presence, nine questions from the jury during their guilt-phase deliberations.

The Warden contends the claim is procedurally defaulted and meritless.

**1. Default**

As the Warden points out, Bryan failed to raise this claim in state court.

Although Bryan argued, in his motion to re-open his direct appeal, that appellate counsel had been ineffective for failing to raise a right-to-be-present claim, that was insufficient to preserve the right-to-be-present claim itself for habeas review. *Davie*, *supra*, 547 F.3d at 312.

I also reject, as I did earlier in this opinion, Bryan's claim that I can excuse this default under *Martinez*, *supra*, 132 S. Ct. at 1311. Because the defaulted claim is not an ineffective-assistance-of-trial-counsel claim, and because *Martinez* is inapplicable in Ohio, that case provides no basis to excuse the default.

**2. Merits**

In the alternative, this claim fails on the merits.

The Constitution guarantees a criminal defendant the right to be present at trial. *U.S. v. Gagnon*, 470 U.S. 522, 526 (1985).

But the right is not absolute. Rather, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to the outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). "[T]his privilege of

113

presence is not guaranteed 'when presence would be useless, or the benefit but a shadow.'" *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-106 (1934)).

I consider the record as whole to determine whether Bryan's absence from any critical stage of the trial was constitutionally improper. *Snyder*, *supra*, 291 U.S. at 115.

Having done so, I cannot accept Bryan's claim that the trial court violated his right to be present. The record shows the trial court advised counsel for both parties of each question the jury submitted. Thereafter, the court permitted counsel to argue their respective positions and told counsel what answer the court would give the jury.

Furthermore, each question – save for the first – concerned a straightforward legal issue.[8] Bryan does not explain, let alone in concrete terms, what he could have offered in responding to the questions that his attorneys failed to offer.

In these circumstances, Bryan has not proved the trial court violated his constitutional right to be present. *Buell v. Miller*, 274 F.3d 337, 363-64 (6th Cir. 2001) (no violation of petitioner's right to be present where petitioner was absent from conference where court and counsel discussed how to answer jury's question).

### M. Due Process Violations

Bryan next claims the trial court violated his due-process rights.

He argues the trial court did so by admitting: 1) testimony from Donnell Wingfield that (a) Bryan and his friends were known to rob drug dealers, and (b) three people had threatened

---

[8] The first question asked whether Officer Leon's radio was on his right or left side. The second dealt with the culpable mental state for the capital specification re. the killing of a police officer engaged in his lawful duties. Questions three through six and eight also dealt with other language of the capital specifications. Questions seven and nine dealt with the non-murder charges.

114

Wingfield, via telephone, before he testified; and 2) testimony from Bryan's girlfriend Janie Winston that Bryan served time in prison, carried weapons, and sold drugs.

Bryan also argues the trial court erred by informing the jury that "ultimately the imposition of the death penalty rests upon my shoulders." According to Bryan, that statement misled the jury into thinking the court, rather than the jurors themselves, had the final say whether Bryan would receive a death sentence.

### 1. Evidentiary Rulings

The Ohio Supreme Court held on direct appeal that, while the trial court erred in admitting some of this evidence (while also properly admitting most of it), the error was harmless:

> Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. "It may, however, be admissible [to show] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

> Bryan argues that the trial court, over defense objection, erred in permitting Winston to testify that Bryan told her he had been in prison for selling drugs and that he had "hit licks" and carried guns.

> Here, Bryan's prison record and his on-going criminal misconduct combined with other evidence of outstanding arrest warrants demonstrated his motive for shooting Leon when Leon was checking Bryan's identification. Cf. *State v. Tibbels* (2001) 92 Ohio St.3d 146, 161, 749 N.E.2d 226, citing *State v. Henness* (1997), 79 Ohio St.3d 53, 61, 679 N.E.2d 686 (defendant's need for drugs as probative of a motive to steal and kill).

> Bryan also claims that the trial court, over defense objection, erred in admitting Donnell Wingfield's testimony. Wingfield testified that Bryan "robbed people" for a living, robbed "drug boys mostly," and associated with "dope boys" who "rob people." When the defense moved for a mistrial because of Wingfield's testimony, the state argued that such evidence explained why Wingfield was a reluctant witness and did not tell the police on June 25 that he saw Bryan shoot Officer Leon.

115

Wingfield's testimony that Bryan and his associates "robbed people" is hearsay. Moreover, the state offered it as evidence of "other crimes, wrongs, or acts" to prove Bryan's bad character. See Evid.R. 404(B). Wingfield's testimony about Bryan's robberies should not have been admitted, since it did not "'tend to show' by substantial proof" motive or any of the other exceptions under Evid.R. 404(B). See *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

However, Wingfield's testimony in this case did not result in prejudicial error, considering the overwhelming evidence of Bryan's guilt. Cf. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 48[.]

Moreover, Wingfield's testimony that Bryan robbed people and robbed mostly dope boys was cumulative of other evidence. As mentioned, Bryan had told Winston that he "hit licks." The defense also stipulated during the guilt phase that Bryan had been convicted of attempted robbery in 1995 and imprisoned and was under indictment for receiving stolen property at the time of the murder.

*Bryan*, *supra*, 101 Ohio St. 3d 291-92.

Bryan contends the Ohio Supreme Court failed to adjudicate his federal constitutional challenge to the admission of this evidence. According to Bryan, I should therefore review this claim *de novo*, rather under § 2254(d).

This contention is unpersuasive.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, *supra*, 131 S. Ct. at 784-85. And "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. Williams*, — U.S. —, 133 S. Ct. 1088, 1096 (2013).

The petitioner may rebut the presumption where "there is reason to think some other explanation for the state court's decision is more likely." *Harrington*, *supra*, 131 S. Ct. at 785.

116

Bryan argues the "more likely" explanation for the state court's failure to refer to his federal claim is that the court "misinterpreted [his] appeal as raising only a state claim or mistakenly believed the analysis of the [state] evidentiary [claim] in and of itself adjudicated his federal claim." (Doc. 63 at 178).

But this contention is purely speculative: Bryan provides no evidence or argument, aside from the lack of an express reference to this claim in the state court's opinion, demonstrating that the state court overlooked his due process claim.

More to the point, review of Bryan's brief provides a more plausible explanation for the state court's decision: Bryan made but one reference to the federal constitution in presenting this claim to the Ohio Supreme Court.

Bryan devoted nearly seven pages of his opening brief to discussing why the admission of the complained-of evidence violated Ohio law. The last line in this section of the brief stated, without elaboration, that "the use of such prejudicial material is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." (Doc. 31 at 113). This presentation of the federal claim, which was hardly substantial or developed, suggests Bryan himself believed the state and federal claims were interchangeable. He did not signal how, if at all, the federal component of his claim differed from the claim's state-law component.

It is more likely the court did not provide a separate analysis of Bryan's federal claim – as opposed to carelessly overlooking that claim – because of Bryan's insubstantial presentation of that claim suggested none was needed, or because the court believed its disposition of the state-law claim necessarily disposed of any corresponding federal claim. *Johnson*, *supra*, 133 S. Ct. at 1095-96.

117

Accordingly, Bryan's claim is subject to the relitigation bar in § 2254(d). And under that standard, it fails.

First, the Supreme Court has never held that a state law or rule of evidence permitting the introduction of "bad acts" or "other acts" evidence to establish the defendant's character or propensity to commit such acts violates the Due Process Clause. *Estelle*, *supra*, 502 U.S. at 65; *Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003); *Gaffney v. Sherry*, 2010 WL 432279, *9 (W.D. Mich.)

Because there is no Supreme Court authority on point, the Ohio Supreme Court's decision could not have been contrary to, or an unreasonable application of, such precedent. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

Second, the Ohio Supreme Court reasonably held that any error in admitting Wingfield's testimony about Bryan's bad character was harmless.

As I have detailed above, the prosecution introduced compelling, and overwhelming, evidence that Bryan intentionally murdered Officer Leon.

Moreover, as the Ohio Supreme Court pointed out, Wingfield's testimony that Bryan robbed mostly drug dealers was cumulative of Bryan's admission, which the prosecution introduced via Janie Winston, that he "hit licks" – slang for robbing drug dealers. The jury knew, because of the parties' stipulation, that Bryan had been convicted of, and served time in prison for, attempted robbery.

Third, the state court reasonably determined Winston's testimony about Bryan's prison record and ongoing criminal behavior, in conjunction with the evidence of the outstanding arrest warrants, was admissible to prove motive. The evidence provides some, though perhaps only slight and

118

tangential, support for the prosecution's theory Bryan murdered Leon to escape detection and apprehension for his past crimes.

For these reasons, the state court's decision was not contrary to, or an unreasonable application of, Supreme Court precedent.

## 2. *Caldwell* Violation

Bryan did not present in state court, and thus procedurally defaulted, his claim that the court misled the jury into believing that the court had ultimate responsibility for imposing a death sentence.

Furthermore, the claim has no merit.

"[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been lead to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985).

"To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407 (1989).

Ohio law provides that, if the sentencing jury finds "that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed[.]" O.R.C. § 2929.03(D)(2). The court may adopt that recommendation and impose the death sentence only if it "finds, by proof beyond a reasonable doubt . . . that the aggravating circumstances . . . outweigh the mitigating factors[.]" O.R.C. § 2929.03(D)(3).

119

Given this legal framework, the Sixth Circuit has held that no *Caldwell* violation occurs when an Ohio trial judge tells the jury that its recommendation that the defendant receive the death penalty is "just that – a recommendation" because that statement accurately reflects Ohio law. *Scott v. Mitchell*, 209 F.3d 854, 877 (6th Cir. 2000); *see also Mapes v. Coyle*, 171 F.3d 408, 414-15 (6th Cir. 1999).

These cases control here. Because the trial court's statement to the jury that it had ultimate authority to impose a death sentence was accurate, no *Caldwell* violation occurred.

## N. Failure to Conduct a Proper Proportionality Review

In his first claim attacking his death sentence, Bryan contends the Ohio Supreme Court violated Ohio law by failing to conduct a proportionality review of his sentence that an Ohio statute, O.R.C. § 2929.05, requires. Because state law guaranteed him the right to such review, Bryan maintains the state court's failure to conduct that review deprived him of a constitutionally protected liberty interest.

This claim rests on a misunderstanding of Ohio law.

Section 2929.05(A) provides that the Ohio Supreme Court must review any death sentence to determine whether it is "excessive or disproportionate to the penalty imposed in similar cases."

According to Bryan, the phrase "similar cases" means not only murder cases in which the defendant received a death sentence, but also murder cases in which the prosecutor: 1) sought, but did not obtain, the death penalty; and 2) could have sought the death penalty but declined, for whatever reason, to do so.

But the Ohio Supreme Court has long rejected this reading of § 2929.05(A).

120

In *State v. Steffen*, 31 Ohio St. 3d 111, 123-24 (1987), the court concluded the statute requires a review of only "those cases already decided by the reviewing court in which the death penalty has been imposed." Consequently, proportionality review under § 2929.05(A) does not include "any case where the death penalty was sought but not obtained or where the death sentence could have been sought but was not." *Id.* at 124.

Because Bryan's claim rests on an interpretation of Ohio law that the Ohio Supreme Court has rejected, his claim is meritless.

Moreover, the Sixth Circuit "has held repeatedly that Ohio's system of proportionality review complies with the dictates of the Due Process Clause." *Williams v. Bagley*, 380 F.3d 932, 962 (6th Cir. 2004).

Because "proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison." *Id.*  In "limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed, Ohio has properly acted within the wide latitude it is allowed." *Id.*; *see also Buell*, *supra*, 274 F.3d at 368-69.

For this reason, too, I reject Bryan's fourteenth claim.

### O. Challenge to Ohio's Lethal Execution Protocol

For his fifteenth claim, Bryan contends "Ohio's lethal injection protocol, practice and procedure" violate the Eighth Amendment.

Although Bryan is not explicit on this point, his claim appears to be that, regardless of the protocols and procedures Ohio might adopt to implement lethal injection, those procedures will be insufficient to ensure Bryan's execution comports with the Eighth Amendment. (Doc. 63 at 229) ("This Court should grant habeas relief by vacating the death sentence if it can be demonstrated

121

through a fully developed factual record that *despite the State of Ohio's best efforts*, *a constitutionally guaranteed humane execution cannot be accomplished.*") (emphasis added).

In resolving this claim, I am mindful Bryan is one of the plaintiffs in *In re Ohio Execution Protocol Litigation*, Case No. 2:11CV1016 (S.D. Ohio), a case pending before Judge Frost in which the plaintiffs – more than 100 condemned Ohio inmates – claim Ohio's execution protocol will, as applied in their individual cases, violate their rights under the Equal Protection Clause.

### 1. Exhaustion and Cognizability

Respondent raises two procedural objections to this claim, neither of which has merit.

First, the Warden contends Bryan failed to raise this claim in state court.

On direct appeal, Bryan raised essentially the same Eighth Amendment objection he now raises, but he directed it at Ohio's then-prevailing method of execution: electrocution. It was not until 2001, after the trial court sentenced Bryan to death and while his direct appeal was pending, that lethal injection became Ohio's sole method of execution. *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007).

I assume for present purposes this was insufficient to exhaust Bryan's current claim.

Nevertheless, dispensing with the exhaustion requirement is appropriate here, *see* 28 U.S.C. § 2254(b)(1)(B)(I), because the Ohio courts provide no means for a condemned prisoner to raise an Eighth Amendment challenge to the execution protocol. *Scott v. Houk*, 127 Ohio St. 3d 317, 318-19 (2010).

Second, the Warden contends Bryan's claim would be cognizable only in a suit under 42 U.S.C. § 1983.

122

As my colleague Sr. District Judge David A. Katz has recently and correctly pointed out, this argument "oversimplifies and misstates the law." *Jones v. Bradshaw*, 2015 WL 1383830, *13 (N.D. Ohio).

In *Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011), the Sixth Circuit recognized that the Supreme Court has never held "that a method-of-execution challenge is not cognizable in habeas or that a federal court 'lacks jurisdiction' to adjudicate such a claim in a habeas action."

On the contrary, the Sixth Circuit also explained in *Scott, supra*, 760 F.3d at 512, that a habeas petitioner can prevail on a lethal injection claim if he can "gather facts showing that Ohio is unable to administer lethal injection in a constitutionally permissible manner."

Recent decisions from my Ohio district court colleagues have held, contrary to the Warden's position, that method-of-execution claims are cognizable on habeas review. *E.g.*, *Jones*, *supra*, 2015 WL 1383830, at *13-14; *Sheppard v. Warden, Chillicothe Corr. Inst.*, 2013 WL 146364, *8 (S.D. Ohio) (Frost, J.); *Smith v. Pineda*, 2012 WL 6021471, *1 (S.D. Ohio) (Merz, J.).

For example, in *Phillips v. Robinson*, 2013 WL 3990756 (N.D. Ohio), Judge Lioi concluded that a claim similar to the one Bryan presses here was cognizable.

The petitioner in that case alleged that Ohio's current execution protocol "create[d] a substantial risk of harm and/or an objectively intolerable risk of harm[.]" *Id.*, at *1. He also maintained "that Ohio is not able, regardless of the policy, protocols, and procedures in effect at any given time to administer the lethal injection in a way that satisfies the Eighth and Fourteenth Amendments." *Id.*, at *2.

After reviewing the Supreme Court's decisions in *Nelson v. Campbell*, 541 U.S. 637 (2004), and *Hill v. McDonough*, 547 U.S. 573 (2006) – both of which permitted method-of-execution claims

123

to proceed in § 1983 suits, but did not resolve whether such claims could also proceed in habeas – as well as the Sixth Circuit's decision in *Adams*, Judge Lioi concluded that whether a method-of-execution claim "sound[s] in habeas or § 1983 centers on whether [the petitioner] is challenging Ohio's execution protocol as a general matter, or seeks to enjoin Ohio from executing him in the manner that Ohio currently intends, and whether he concedes that Ohio ever could execute him in a constitutional manner." *Id.*, at *5.

Because the petitioner in *Phillips* contended Ohio could not constitutionally execute him, regardless of any changes it might make in its execution protocol, Judge Lioi held the claim was cognizable.

I follow that approach here in concluding Bryan's claim is also cognizable.

Like the petitioner in *Phillips*, Bryan challenges Ohio's lethal injection protocol in its entirety, and does not concede the existence of a safe alternative.

At its core, Bryan's claim includes not only "specific complaints [about the execution protocol] that could be remedied without *necessarily* precluding lethal injection altogether," but also broader challenges suggesting that "the State's administration of that protocol, as a whole, poses an 'objectively intolerable risk of harm' such that it could be 'seen as barring the execution of [Bryan's] sentence.'" *Id.*, at *6 (quoting *Hill*, *supra*, 574 U.S. at 581) (emphasis in original).

For these reasons, Bryan's claim is cognizable.

### 2. Merits

Although Bryan's claim is cognizable and ripe for review, it lacks merit under *Glossip v. Gross*, — U.S. —, 2015 WL 2473454 (U.S.), *Baze v. Rees*, 553 U.S. 35 (2008), and, more particularly, *Cooey v. Strickland*, 589 F.3d 210 (6th Cir. 2010) (*Cooey II*).

124

In *Baze*, *supra*, 553 U.S. at 50, the Supreme Court held that, to prevail on a claim that an execution protocol poses an unconstitutional risk of harm, the prisoner must show that "the conditions presenting the risk must be *sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers." (emphasis in original).

Accordingly, "a condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative." *Id.* at 51. Rather, the prisoner's proposed alternative "must be feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain." *Id.* at 52.

The Court reiterated and reaffirmed these principles in *Glossip*, *supra*, 2015 WL 2473454, at *9-10.

The Sixth Circuit applied the *Baze* standard in *Cooey II*, *supra*, 589 F.3d at 223-32, to hold that Ohio's single-drug execution protocol and the back-up contingency protocol comply with the Eighth Amendment.

*Cooey II* rejected many of the same arguments Bryan presses here.

First, the court held that "[t]he majority of claims regarding the one-drug" protocol "are foreclosed by *Baze* and its progeny." *Id.* at 223; *see also id.* at 225 ("Permitting constitutional challenges to lethal injection protocols based on speculative injuries and the possibility of negligent administration is not only unsupported by Supreme Court precedent but is also beyond the scope of our judicial authority.").

Second, the court rejected the prisoner's claim that "Ohio's protocol is constitutionally deficient on the basis of poorly trained personnel or the ceding of too much discretion [in carrying out the execution] to those personnel[.]" *Id.* at 226.

125

Third, the court held that the Ohio protocol contained constitutionally adequate provisions for supervising staff and the inmate during an execution.

Like the Kentucky protocol upheld in *Baze*, Ohio's protocol "calls for the medical team to administer the drug remotely by IV while the Warden and Director of [the Ohio Department of Rehabilitation and Corrections] remain in the execution room to visually inspect the prisoner to determine if he is unconscious, needs further injections, or exhibits any problems with the IV catheters and tubing[.]" *Id.* at 227.

Finally, the court rejected all challenges to Ohio's contingency protocol. *Id.* at 229-32.

In light of these precedents, which Bryan neither acknowledges nor attempts to distinguish, his challenge to Ohio's execution protocol lacks merit. Bryan argues, for example, that there is a risk state officials will not follow the protocol or the written guidelines implementing them. He also contends there is no empirical data showing a single dose of five grams of pentobarbital – or, for that matter, the whole of Ohio's contingency protocol – can effect an execution free of substantial risk of severe pain or injury.

But as my discussion of *Cooey II* shows, the Sixth Circuit has already held these arguments are insufficient to prove an Eighth Amendment violation.

While Bryan cannot obtain habeas relief on this claim, Sixth Circuit precedent suggests he may pursue a similar claim in the *Ohio Execution Protocol Litigation* case. *Frazier*, *supra*, 770 F.3d at 505 (concluding that, because petitioner was party to *In re Ohio Execution Litigation Protocol*, "that litigation is the proper avenue . . . to bring this constitutional challenge" alleging Ohio is unable to administer its lethal injection protocol in constitutionally permissible manner); *Scott*, *supra*, 760 F.3d at 512 (same).

126

## P. Constitutionality of the Death Penalty

Finally, in his sixteenth claim, Bryan argues the death penalty is unconstitutional.

He alleges that Ohio authorities "impose[ ] the death penalty in a racially discriminatory manner" because "[b]lacks and those who kill white victims are much more likely to get the death penalty." (Doc. 18 at 174). Bryan observes that, even though African-Americans constitute less than twenty percent of Ohio's population, "about half of Ohio's death row inmates are African-American." (*Id.*).

He also contends the death penalty violates international law.

Contrary to the Warden's argument, Bryan raised these claims on direct appeal and thus preserved them for habeas review. But Bryan is not entitled to relief because the Ohio Supreme Court's decision rejecting these claims, *Bryan*, *supra*, 101 Ohio. St. 3d at 305, was reasonable.

First, the Sixth Circuit has consistently rejected claims that Ohio's death penalty regime operates in a racially discriminatory fashion. *Coleman v. Mitchell*, 268 F.3d 417, 441 (6th Cir. 2001) (rejecting claim that Ohio's death penalty was unconstitutional because of "striking racial discrepancy between African American representation in the Ohio population generally (9%), and such representation on Ohio's death row (49%)"); *see also Keene v. Mitchell*, 525 F.3d 461, 463-65 (6th Cir. 2008); *Smith v. Mitchell*, 348 F.3d 177, 211-12 (6th Cir. 2003).

Second, Bryan has not identified, and I have not found, any Supreme Court precedent holding the death penalty violates a treaty or other international agreement to which the United States is a party. Accordingly, this component of Bryan's claim lacks merit. *Musladin*, *supra*, 549 U.S. at 77.

127

**Conclusion**

It is, therefore,

ORDERED THAT: Bryan's petition for a writ of habeas corpus (Doc. 1) be, and the same hereby is granted. The State of Ohio must release Bryan from custody on the conviction at issue in this case unless, within 120 days of the entry of this order, it begins proceedings to afford Bryan a new trial.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge
